UNITED STATES of America, Plaintiff-Appellee,

v.

Joan Belle RITZ, Linda Ann Ritz, Robert M. Ritz, Jr. and John Paul Ritz, Defendants-Appellants.

No. 76–1715.

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1977.

Michael F. Cycmanick, Orlando, Fla. (Court-Appointed), for Joan Ritz.

Philip M. Schutzer, Orlando, Fla. (Court-Appointed), for Linda Ritz.

Donald R. Corbett, Orlando, Fla. (Court-Appointed), for Robert Ritz.

Alan C. Todd, Winter Park, Fla. (Court-Appointed), for John Ritz.

John L. Briggs, U. S. Atty., Jacksonville, Fla., William F. Duane, Harrison T. Slaughter, Jr., Asst. U. S. Attys., Orlando, Fla., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by members of the Ritz family of the unincorporated community of Bithlo, Florida from their convictions of having individually knowingly passed a total of seven counterfeit $50 bills between April 24 and August 24, 1975 and of having conspired together and with one other person to pass these counterfeit bills.

The principal grounds of appeal are: (1) lack of sufficient evidence of knowledge on the part of any of the four defendants of the counterfeit nature of the bills which they individually passed and lack of sufficient evidence to warrant the jury's finding that they had conspired together; (2) the alleged error of the trial court in permitting the Government to place the husband of one defendant who was also the father of two others and the father-in-law of the remaining defendant on the witness stand for questioning after the court had been informed that such witness would refuse to answer by claiming his rights under the Fifth Amendment.

Bearing in mind that conviction under 18 U.S.C. § 472 [1] requires proof not only of the passing of the bill or note but also proof of intent to defraud, we outline the following statement of the proof as it affects each of the four individual defendants. There was a fifth defendant in the original indictment, but the case of Cindy Slagle, a friend of the family but not a relative, was severed for trial.

## BACKGROUND AS TO ALL DEFENDANTS

ROBERT RITZ lived in a trailer home with his wife, defendant Joan Ritz, his second son, defendant John Paul Ritz, his third son, Raymond Ritz, 18 years of age, and a young daughter, 14. Within a mile lived his oldest son, defendant Robert Ritz, Jr. with his wife, defendant Linda Ritz. He was engaged in the automobile repair business and driving a tow truck for a salary. In addition, he had a lean-to backyard auto repair shop where he, with the help of Robert, Jr. and John Paul, worked on body and fender repairs for cash. The nearest town with a bank is seven miles away. Robert Ritz, Sr. was a *paterfamilias* who divided out his money among his wife and children as they needed it. The earnings of the group were apparently minimal.

The indictment and trial involved the passing of seven counterfeit bills. For convenience in the discussion of the evidence, these bills will be numbered from one to seven and the evidence relating to the activities of each individual defendant will be discussed separately.

## ROBERT RITZ, JR.

On April 24, Robert, Jr. and his wife, Linda, bought merchandise in a T.G. and Y convenience store in Pine Hill, Florida. Robert handed the checkout cashier a $50 bill (Bill No. 1) in payment for the merchandise. The cashier explained that she was unable to change the $50 bill and had to call her supervisor. The supervisor came over to the register and took the $50 bill, whereupon Robert received his change and the merchandise and the couple departed. This is the only one of the bills which Robert was charged with passing. However, as will be discussed under John Paul Ritz' case below, the evidence showed that the three bills, No. 5, 6 and 7, were received by John from Robert, Jr. for work done by John on the automobile of Marilyn Cohen, who testified to the fact that she had paid Robert $400 in $50 bills which she had just withdrawn from the bank the same day.

1. Section 472 provides as follows:

   "Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

## LINDA RITZ

Linda is Robert, Jr.'s wife. On May 24, she and her mother-in-law, Joan, and Cindy Slagle, a friend of the younger Ritz family members, went in Joan's automobile to Titusville, a neighboring city. *Joan* Ritz went to a Winn-Dixie store and paid with a $50 bill (Bill No. 2) of the same make, manufacture and serial number as the other bills involved for $43.43 worth of groceries. Linda Ritz was not present on this occasion but it is mentioned as an element of evidence in Linda's case because of the fact that the three women went to Titusville together.

Later the same day, Joan and Linda Ritz and Cindy Slagle went to a Woolco store where *Linda* handed a clerk a $50 bill (Bill No. 3) in exchange for merchandise. There is no evidence that either Joan or Cindy saw the bill or knew of the method of payment for the merchandise.

Later, Linda and Cindy Slagle went to a Sears store in the same shopping mall and *Cindy* offered a $50 bill (Bill No. 4) for merchandise which she had picked out. The clerk felt that the bill was thicker and bluer in color than a normal bill and took it to her manager who called the police. The police appeared and questioned the two women concerning the bill but did not arrest them. A few minutes later, however, the police approached the vehicle being driven by Joan and containing Linda and Cindy and asked them to follow them to the police headquarters for further questioning. At the headquarters, Secret Service Agent Connally after adequate cautionary instructions, interviewed the witnesses separately. Joan informed Agent Connally that she had obtained the $50 bill which she passed at Winn-Dixie from Cindy Slagle. Linda informed Connally that Cindy Slagle had given her the $50 bill that she had passed at Woolco.

A week later, Joan and Linda were subpoenaed to appear before the grand jury in Orlando, after having again been given the necessary cautionary instructions. They both testified before the grand jury that they had answered Agent Connally's question falsely as to getting the bills from Cindy because they knew that Cindy had already been found with a bill and they thought that they could end the interviews most quickly that way. They freely confessed that they answered falsely Agent Connally's question. Each said that she had received the bill from her husband, Joan from Robert, Sr., the *paterfamilias* and both unindicted and unnamed as a co-conspirator, and Linda from Robert, Jr.

There was no evidence that Linda Ritz either saw the $50 bill tendered by Cindy Slagle at the Sears store or knew that it was being used until the clerk questioned its genuineness.

## JOAN RITZ

As is indicated under the discussion of the evidence as to Linda, Joan Ritz on May 24, took her daughter-in-law, Linda, and their friend, Cindy Slagle, to Titusville. There Joan went by herself to a Winn-Dixie store and used a $50 bill (Bill No. 2) for what she later testified was $43.43 worth of groceries. Neither other woman was present at the Winn-Dixie store.

Later the same day, as already stated above, Joan and the two younger women then went to a Woolco store where Linda handed a clerk a $50 bill, in exchange for merchandise (Bill No. 3). There is no evidence that Joan saw this bill or knew that such a bill was being used for payment of the merchandise.

Later, Joan was taking Linda and Cindy Slagle home in her automobile when they were stopped by the Titusville police for the questioning which is discussed above.

The Government's brief which states: "Linda Ritz and Joan Ritz both admitted being in Winn-Dixie, Woolco, and Sears and passing $50 bills in their grand jury testimony" is clearly an inaccurate statement. In their grand jury testimony Linda Ritz admitted being at Woolco only.[2] Joan Ritz admitted in her grand jury testimony only

---

2. It is otherwise proven however that she was also at the Sears store with Cindy Slagle.

that she was at Winn-Dixie.[3] The statement that Linda Ritz and Joan Ritz both admitted passing $50 bills may also be misconstrued in that it carries the implication that each of them admitted passing more than one $50 bill. As to this, there is no proof in the record.

## JOHN PAUL RITZ

Three months later, on August 24, John Paul Ritz, the second son of Joan and her husband, Robert Ritz, Sr., together with a girl friend and his younger sister went on a trip to Disney World where they spent the day. He arrived at the amusement park with approximately $170 including the three $50 bills (Bills No. 5, 6 and 7). After obtaining admission tickets for himself and his girl, he had the three bills and a few dollars change. He paid the first of the $50 bills in payment of some women's hats that the female members of the party wanted to buy. The counterfeit nature of the bill was not noticed when he received his change without incident. The party walked around Disney World making various purchases with the change received and he later used one of the two remaining $50 bills to purchase lunch, staying at the restaurant for a couple of hours after paying for the lunch with Bill No. 6, which apparently was not identified as being counterfeit. The luncheon bill was approximately $12. He and his companions also purchased some red balloons which they carried on strings around the amusement park, a fact which counsel suggests clearly indicates an ease of conscience that would not exist if they were afraid of a discovery of the counterfeit and a search for the passers. John Paul paid the last $50 bill for dinner for himself and his girl friend, his younger brother and sister, totalling approximately $20. The party continued sightseeing for several hours at which time he was arrested and taken for questioning. This defendant said that he had received the three $50 bills from his brother, Robert, Jr., the evening before for work he had performed on an automobile belonging to Marilyn Cohen.

He testified that Robert had promised him this amount for the work he was to do and he planned the trip to Disney World in reliance on this promise. He testified that he had never seen a $50 bill before in his life and that he was so proud of having these three fifties that he showed them to his girl friend and her mother the evening before the trip to Disney World. As indicated above, Ms. Cohen testified that she withdrew $450 from her bank account on August 22, that she asked the teller for the money to be paid in $100 bills, but that the teller said she would give her $50's. The teller gave her the eight $50 bills and smaller bills to make up the $450. She testified that she did not examine the bills but that she turned eight of them over to Robert, Jr. the day she took them out of the bank. As indicated, John took the stand and testified on his own behalf at the trial. He lived with his parents and usually had dinner with them each evening and learned of the occurrence the night his mother was detained and questioned by the police. On August 24, when John passed the bills at Disney World, none of the other defendants had been indicted or otherwise charged.

## SUMMARY OF EVIDENCE

Because some of the evidence as to a single individual is relevant for consideration in weighing the quantum of proof as against some of the others, it is necessary to summarize the evidence as to all.

Robert Ritz, Jr. passed one counterfeit $50 bill which he had received from his father, unindicted and unnamed as a coconspirator, on April 24. On August 22, having received $400 in $50 bills from a customer, he gave three $50 bills to his brother, John, for work on the car and which John passed at Disney World. These three bills were counterfeit and were of the same denomination and serial number as all of the other four bills involved in this case.

On May 24, Joan, the mother, Linda, the daughter-in-law, and Cindy, a friend, went to Titusville where Joan passed one $50 bill

---

3. It was otherwise proven, when she took the stand, that she also was present at Woolco.

for $43 worth of groceries. She was the only person present at the Winn-Dixie store. Later she accompanied the other two women to a Woolco store at which Linda made some purchases for which she paid a $50 counterfeit bill, which was handled by two cashiers without detection of its counterfeit nature. Still later Linda accompanied Cindy to a Sears store at which Cindy sought to pay for merchandise with a $50 bill of which the cashier was suspicious and which was then determined to be counterfeit.

The three women were then stopped on their way home by Titusville police and when questioned separately, Linda and Joan falsely stated that they had obtained the counterfeit bills from Cindy. They admitted the falsity of this testimony when they were called before a grand jury a short while later.

There is no evidence to indicate that upon the passing of any one of the three bills just mentioned, any other person present either saw the bill or knew that it was being used by the person who was actually making the purchase.

Three months later, on August 24, John Paul Ritz, who said he had received three $50 bills from his brother, Robert, Jr. for work on Marilyn Cohen's car, spent these three $50 bills at Disney World. At the end of the day, he had $80 to $90 in cash left in his pocket. When asked why he had not spent some of the change from the earlier bills instead of cashing new $50's, he answered that he was unable to cash a $50 bill in Bithlo, so that he wanted them all changed before he returned home.

## THE FIFTH AMENDMENT PROBLEM

The Government announced in open court: "At this time the Government would call Mr. Robert Ritz, Sr." At the request of counsel, the parties approached the bench, and out of the hearing of the jury the following colloquy took place. (Mr. Duane was Government counsel and the others named represented different defendants):

"MR. TODD: . . . There is a possibility he might invoke his Fifth Amendment rights and the jury should be excused and I think we should proffer his testimony and the court should advise him of his rights to counsel and it shouldn't be done in the presence of the jury.

MR. SHUTZER: I am joining in on that matter.

MR. DUANE: Just to clarify matters, the Government has no knowledge at all that Mr. Ritz intends to invoke his Fifth Amendment rights. On May 27th, 1975 in the U. S. Attorney's Office, Mr. Ritz gave a statement concerning his possession and he did not invoke his Fifth Amendment privilege at that time. He indicated at that time he had no knowledge.

MR. TODD: I think this ought to be done outside the presence of the Jury.

MR. DUANE: Your Honor, Mr. Ritz, on May 27th, gave a statement to the effect that he gave certain of these notes to his daughter and to his daughter-in-law, to his wife and to the boyfriend of Cindy Slagle. He indicated that he had no knowledge that these bills were counterfeit. The Government has a right and an obligation to call him.

MR. TODD: I don't argue with that. They have a definite obligation to call him, but the Court should advise this man of his constitutional rights outside the presence of the Jury.

MR. DUANE: He has not invoked these rights before and the Government believes that every witness should testify in a criminal trial. The Government has a right to subpoena them.

THE COURT: Oh, I think there's no indication here that he's going to invoke his rights. There is no indication to me.

MR. CORBETT: I do think the Court should advise the man before he takes the stand, of his rights.

MR. TODD: I don't think this should be done in the presence of the Jury.

THE COURT: I've done this many times."

The court then proceeded with the case before the jury and the witness was sworn, whereupon the following occurred:

"THE COURT: Sir, you are Mr. Robert Ritz, Sr.?

THE WITNESS: Senior.

THE COURT: The Court has some indication here that you're being called as a witness relative to some matters involved in this case. The Court is required to advise you that you may not be required to answer any questions which you think might tend to incriminate you in any involvement in any criminal action. The Court is required to tell you this is your constitutional privilege that you have and you may exercise it. You are not required to, but you are entitled to. Do you understand what I've said?

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

ROBERT RITZ, SR. called as a witness by the Government, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. DUANE: State your name, please?

MR. CYCMANICK: How about his right to counsel? He has a Sixth Amendment privilege.

MR. TODD: Yes, Your Honor, to consult with counsel before he makes a decision.

THE WITNESS: Yes, I would like—

THE COURT: Do you have counsel?

THE WITNESS: No.

THE COURT: You have a right to consult with counsel if you wish. You may step down. How long will this take?

THE WITNESS: I don't know, Your Honor."

Thereupon the court took a recess. Counsel, Mr. R. J. Stevens, was appointed to advise the witness. Thereafter, the court out of the presence of the jury, reopened the hearing. Government counsel then stated: ". . . Mr. Stevens has advised me he has been appointed to represent Mr. Ritz and he plans on advising his client to take the Fifth Amendment in this case."

Thereafter the jury was called back and the following occurred:

"THE COURT: Mr. Ritz, take the witness stand. Mr. Ritz, before noon, you requested that I make arrangements to see to it that you could consult an attorney and I asked the Marshal to take you down to the Magistrate's office so that arrangements could be made for that purpose. Was that done?

THE WITNESS: Yes, sir.

THE COURT: To your satisfaction?

THE WITNESS: Yes, sir.

THE COURT: And was an attorney appointed to advise you?

THE WITNESS: Yes, sir.

THE COURT: Is this Mr. Stevens?

MR. STEVENS: For the record, Your Honor, my name is R. J. Stevens, counsel appointed for Mr. Ritz.

THE COURT: Have you had an opportunity to fully advise him of his rights and privileges before the Court?

MR. STEVENS: Yes, sir, I believe I have.

THE COURT: Are you satisfied that he has fully advised you, Mr. Ritz, and you had a full opportunity to discuss these matters with him?

THE WITNESS: Yes, sir.

THE COURT: Were his services satisfactory to you?

THE WITNESS: Yes, Your Honor.

THE COURT: Very well, Are you ready to proceed?

THE WITNESS: Yes, sir.

DIRECT EXAMINATION (Continued)

BY MR. DUANE:

Q. State your name, please?

A. Robert A. Ritz.

Q. And where do you live, Mr. Ritz?

A. Bithlo.

Q. I'd like to ask you if you recognize any of the people over there (indicating)?

A. Yes.

Q. Who do you recognize?

A. My wife, my daughter-in-law, my sons, and their attorneys.

Q. Okay. Do you have two sons over there?

A. Yes, I have.

Q. What are their names?

A. Jack—Robert and John.

Q. Where do you live?

A. Bithlo, Florida.

Q. How big a city is Bithlo?

A. Very small.

Q. How many people approximately live there?

A. I don't know.

Q. Do you know?

A. No.

Q. Do you know a lot of people that live there?

A. No.

Q. You don't know many of the people that live there?

A. No.

Q. What do you do, Mr. Ritz?

A. I work at Triple A Truck Parts.

Q. What do you do?

A. Mechanic and a truck driver.

Q. Do you also operate a body shop at your house?

A. I stand on the Fifth Amendment.

Q. Are you saying that telling me whether or not you operate a auto body shop at your home is going to incriminate you?

A. I'd rather stand on the Fifth Amendment.

THE COURT: Mr. Ritz, are you not answering the question and your reason for not answering the question is because if you feel you do, it might have some tendency to incriminate you?

THE WITNESS: Yes.

THE COURT: The Court's going to sustain his request.

BY MR. DUANE:

Q. Mr. Ritz, did you see your wife, your son Robert, and your son John or let's talk about Robert and his wife Linda and Joan your wife, on April 24th, 1975?

A. Did I see them?

Q. Did you see them?

A. Yes, I imagine so.

Q. Where did you see them?

A. I see them every day at home.

Q. Speak up.

A. At home I see them there, yes.

Q. Did you have an occasion to give them anything?

A. No, I stand on the Fifth.

Q. You said no. You did not give them anything?

A. No, I stand on the Fifth Amendment.

Q. Well, just let me ask you the question again and ask you whether you're answering yes or no to that question.

MR. CYCMANICK: I make an objection, first, Your Honor. I think what we're witnessing here is rather an embarrassing and tortuous question. I think that the witness tried to communicate or indicate to everyone here that answers to the questions may tend to incriminate him.

THE COURT: Yes, I think so, Mr. Duane.

MR. DUANE: I think we have a right to find out which ones, Your Honor.

MR. CYCMANICK: Judge, the Government does not have such a right because it may incriminate him by asking such a question. He has a right to invoke his privilege.

MR. DUANE: He's represented by an attorney here. He's making objections for his attorney. I think his attorney is capable to make his own objections.

THE COURT: It's not that he has to rely on his attorney, Mr. Duane. He has the right to exercise his own privileg-

es. This is his privilege. I think he's exercising his privilege that he's not going to testify. I think it would not produce anything beneficial to the trial to make further inquiry of him.

MR. DUANE: Did you want me to withdraw that Your Honor?

THE COURT: Yes, you may step down."

We consider it necessary to quote the entire colloquy with respect to this matter in order fully to deal with the appellant's contention that the placing of the father of this family on the witness stand by the Government which was prosecuting his wife and three children by asking him whether, on April 24th, 1975, he had "an occasion to give them anything," which resulted in the witness' refusal to answer on the ground that it might tend to incriminate him was highly prejudicial to their case.

We have no doubt that this whole contretemps was in fact prejudicial to the defendants. It would be difficult to see how the average juror could fail to assume that the Government would not put on the witness stand to testify against his wife and children any witness who did not have some pretty strong evidence to help the Government's case. Assuming, as the jury should, that counsel, in seeking the father's testimony was acting in good faith with the idea that what he would say would be relevant and material in proving the guilty knowledge of the defendants, how could the jury feel otherwise than that if Robert Ritz, Sr. had answered his testimony might not only have placed him in jeopardy but would also have helped convict the four defendants. This is not the case of the "ordinary witness," as described in *San Fratello v. United States*, 340 F.2d 560 (5th Cir. 1965) as:

"That is, . . . one not so closely connected with the defendant by the facts of the case, the pleadings, or relationship that the inference of the witness' guilt would likely be imputed to the defendant. . . . But a defendant's spouse or a co-defendant would not come within that category," citing many cases. 340 F.2d at 565, footnote 6.

The mere fact that this occurrence was prejudicial to the defendants would not, of course, be a basis for a reversal of the convictions. We must next determine whether the proceedings amounted to reversible error.

■ Once again, as we did above with respect to a statement in the Government's brief that "Linda Ritz and Joan Ritz both admitted being in Winn-Dixie, Woolco and Sears and passing $50 bills in their grand jury testimony" we must point out two incorrect statements in the Government's brief touching on the testimony of Joan Ritz. The brief says: "Also both the grand jury testimony of Joan Ritz and her own testimony at trial consistently referred to the fact that she had received the bills in question from her husband thus making the husband's testimony superfluous." Later the brief states: "The fact that Joan Ritz had received the $50 bills from her husband was never an issue for the jury as she had admitted receiving the bills from her husband in her testimony both before the grand jury and in her own testimony at trial. Trp. 661, 946." Neither Joan Ritz' testimony before the grand jury nor her own testimony at trial at the noted pages or anywhere else in the record, as far as we have been able to find, admits to her having received any more than one single $50 bill from her husband. Bearing on the issue of knowledge in counterfeit cases, one of the most critical inquiries is whether the person accused has passed more than one counterfeit bill. It is a serious inaccuracy, therefore, for the Government to state that she had anything to do with $50 bills other than as shown by the proof with respect to the one bill which she passed at the Winn-Dixie store.

However, the Government's concession in the language quoted above that the testimony of Robert Ritz, Sr. was "superfluous" is significant as we consider the present state of the law with respect to the handling by the trial court of a witness closely associated with the accused when it is known that he will take the Fifth Amendment. If, in fact, the father's testimony

was superfluous, then it is difficult to see the purpose for which he was called to the witness stand to testify against his wife and children, especially after Government counsel notified the trial court that his specially appointed counsel "plans on advising his client to take the Fifth Amendment in this case."

Counsel for all of the defendants moved for the trial court to advise the prospective witness of his rights under the Fifth Amendment out of the presence of the jury and to make a proffer of his testimony in order that the court might determine the extent to which the privilege might extend. Overruling the motion, the court proceeded to notify the witness in open court that he had a right to exercise the privilege and then agreed, before the jury also, to appoint a lawyer to advise him in this respect. Thereafter, after having been notified by the Government that Mr. Ritz would be advised to take the Fifth Amendment, the court permitted questioning to commence and proceed until questions were asked by Government counsel touching on the operation of the body shop and whether Mr. Ritz had given anything to the members of his family on April 24, the day on which Robert, Jr. passed the $50 bill at the T.G. and Y store.

Recognizing as we must, that the questions asked of Mr. Ritz were "superfluous" because there was other evidence available to the effect that the father did operate a body shop at his house and that he did give the $50 note to Robert, Jr., we are at a loss to see any purpose for having this drama played out before the jury other than that of having the jury draw inferences from Robert Ritz, Sr.'s refusal to answer the questions. Such inferences are, of course, not permitted but they exist, as recognized by such cases as *United States v. Maloney*, 2 Cir., 262 F.2d 535:

"When a witness claims his privilege, a natural, and indeed almost inevitable, inference arises as to what would have been his answer if he had not refused. If the prosecution knows when it puts the question that he will claim the privilege,

it is charged with notice of the probable effect of his refusal upon the jury's mind. . . . Such refusals have been uniformly held not to be a permissible basis for inferring what would have been the answer, although logically they are very persuasive. How to deal with them is another matter, not easy to decide; but it is clear, not only that the presumed answer has not the sanction of an oath, but—what is even more important—that the accused cannot cross-examine. If they once do get before the jury, there arises, as we have said, a strong probability that they will be taken as evidentiary." 262 F.2d at 537.

The Government relies on *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1962) for the proposition that a procedure such as was used in this case does not invariably amount to reversible error. This is true. However, the Supreme Court in *Namet* clearly recognized that in the case of prosecutorial misconduct or where "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross examination, and [which] thus unfairly prejudiced the defendant," reversible error might exist. As to prosecutorial misconduct the Court referred to *United States v. Maloney, supra,* stating:

"In that case, the prosecution admitted knowing that two of its key witnesses could validly invoke the privilege against self incrimination and intended to do so. The prosecutor nevertheless called and questioned them. The court also found that the government's closing argument attempted to make use of the adverse inferences from their refusal to testify. . . . " 373 U.S. at p. 186, 83 S.Ct. at p. 1155.

In the case of the Ritz family, the Government itself notified the court that counsel for the witness would advise him to invoke the Fifth Amendment.

In addressing the problem occurring when inferences from a witness' refusal to answer might add "critical weight to the prosecution's case in a form not subject to

cross examination" the *Namet* court again referred to *Maloney*, a case which contained the language we have already referred to above.

Subsequent to the *Namet* case, this Court has held in *San Fratello v. United States, supra*, that it was error for the Court to require the wife of a defendant in a criminal case "to claim her privilege against self incrimination in the presence of the jury in a situation in which the government knew that the claim of privilege would be made." The Court said there:

"There is nothing about the government's right to have a witness claim his privilege in response to specific questions while on the stand under oath that requires it to be done in the presence of the jury. As was said in *State of Iowa v. Chrismore*, 223 Iowa 957, 274 N.W. 3, where the defendant objected to the action of the prosecution calling as a witness a woman he had married between the dates of the offense and the trial, '. . . If there was any doubt about the truth of this testimony (about the marriage), investigation of the fact could have been made in the absence of the jury, thereby avoiding the effect which would seem inevitably to follow this sort of examination.' Professor Wigmore says that, 'The layman's natural first suggestion would probably be that the resort to privilege in each instance is a clear confession of crime.' 8 Wigmore, Evidence, 3d Ed., # 2272, p. 426. See also, *United States v. Maloney*, 2 Cir., 262 F.2d 535, 537. Even in the face of this inevitable inference, it may well be proper in some cases to have the proceeding in the presence of the jury where the government is dealing with what has sometimes been called the "ordinary" witness; that is, with one not so closely connected with the defendant by the facts of the case, the pleadings, or relationship that the inferences of the witness' guilt would likely be imputed to the defendant. The circumstances could be such that the jury would naturally expect the witness to be called. But a *defendant's spouse* or a co-defendant would not come within that category. [Citations omitted]." 340 F.2d at p. 565. [Emphasis added.]

It seems unnecessary to belabor the proposition that the relationship of Robert Ritz, Sr. to these members of his family should be viewed in no different light than the relationship of a spouse to a defendant. In fact, of course, the relationship was the same with respect to the case of Joan Ritz. Here, the defendants made every effort to have the trial court determine out of the presence of the jury what the scope of the privilege and the scope of the witness' claim to exercise it would be. Instead, the court required the witness to claim the privilege in open court after questions were asked. His answers may well have tended to incriminate both the witness and the defendants. The fact that the witness claimed his privilege then, of course, made it impossible for defendant's counsel to cross examine the witness to attempt to dispel any inferences that the jury may well have drawn from the claiming of the privilege by the witness.

This Court has dealt with the problem presented by a trial court's striking the testimony of a witness who claims the Fifth Amendment privilege after testifying partially to facts damaging to the defendants and thus depriving the defendant of an opportunity to cross examine with respect to the damaging evidence, which has been stricken from the record by the trial court. In *United States v. Demchak*, 545 F.2d 1029 (5th Cir. 1977), the defendant's father testified briefly against the defendant. The Court limited cross examination and then subsequently struck the father's adverse testimony and instructed the jury not to consider it. Apparently the Court struck the father's testimony because it was not subject to cross examination by virtue of the father's Fifth Amendment privilege. In that case we said: "Because this instruction called for mental discipline beyond what might reasonably be expected of a jury, we reverse for a new trial." As we said in *Demchak*: "In situations such as this, *in camera* hearings can often avoid the waste of judicial resources attendant on

mistrial. The defense requested without success an *in camera* hearing to demonstrate the degree to which its cross examination would be impaired. Such hearings are well-established techniques for avoiding prejudicial error in adjudicating conflict between Fifth and Sixth Amendment rights." So, too, in this case an *in camera* hearing relative to the testimony of Robert Ritz, Sr. would have avoided difficulties which we now face.

■ In line with our decision in *San Fratello, supra,* and *Demchak, supra,* we conclude that it was reversible error for the trial court to permit the husband of one defendant who was also the father of two others under the circumstances outlined above, to take the witness stand and testify up to the point where an anticipated answer to a question posed by the Government would most likely be assumed by the jury to be inculpatory when the taking of the Fifth Amendment by the witness prevented defense counsel from cross examining such witness. We do not here have a question whether such procedure would be clear error, for counsel made every effort to have the question whether Robert Ritz, Sr. would take the Fifth Amendment determined *in camera* and thus out of the hearing of the jury. It is difficult to understand what objection the Government could fairly have to such a proceeding. As this Court said in *San Fratello* : "There is nothing about the government's right to have a witness claim his privilege in response to specific questions while on the stand under oath that requires it to be done in the presence of the jury." 340 F.2d at 565.

## ANALYSIS OF THE EVIDENCE

■ *A. Inferring guilty knowledge.* As we have repeatedly said, to prove a violation of 18 U.S.C. § 472, the Government must not only show that the accused passed or possessed counterfeit money, but also that he did so with intent to defraud. The requisite *mens rea* cannot be proved by a showing of possession or passing alone. *See, e. g., United States of America v. Haggins,* 545 F.2d 1009 (1977); *United*

*States v. Jiminiz-Serrato,* 451 F.2d 523 (5th Cir. 1971) (possession); *Paz v. United States,* 387 F.2d 428 (5th Cir. 1967) (passing).

■ In *Haggins* and *United States v. Bean,* 443 F.2d 17 (5th Cir. 1971) we referred to a number of circumstances from which guilty knowledge may be inferred once a passing has occurred; a rapid series of passing of several notes, *e. g., Ruiz v. United States,* 374 F.2d 619 (5th Cir. 1967); passing to several different establishments, *Marson v. United States,* 203 F.2d 904 (6th Cir. 1953); use of large counterfeit bills rather than change received in prior purchases, *Carrullo v. United States,* 184 F.2d 743 (8th Cir. 1950); "furtive conduct;" "acquisition of bills at a discount;" "knowledge that the bill had previously been turned down;" attempt to destroy or abandon counterfeit currency when capture is imminent. *See United States v. King,* 326 F.2d 415 (6th Cir. 1964); *United States v. Kelley,* 186 F.2d 598 (7th Cir. 1951).

*B. "Negative" evidence.* The indictments against the Ritz family involved the passing of seven counterfeit bills, one on April 24, three on May 24, and three on August 24. With respect to all six of the bills passed by members of the Ritz family, they were accepted by cashiers or other persons receiving money for services or merchandise without question, thus indicating to that extent that they were not so obviously counterfeit as would permit the jury to determine that the person passing them was charged with knowledge from their appearance alone. With respect to the three bills passed on May 24, there is no evidence that any defendant other than Joan Ritz was present when she passed her $50 bill in return for $43.43 worth of groceries. Nor is there any evidence that Joan was aware of the identity or denomination of the bill paid by Linda for merchandise on that same day. Joan was not present at the time Cindy passed her bill later in the afternoon. As noted above, Cindy is not one of the defendants tried in this case.

Although John Paul passed three bills during a daylong visit to Disney World,

including the payment for luncheon and dinner for himself and friends, his story of having received three $50 bills in payment for work done on Marilyn Cohen's automobile was fully supported by the latter's testimony (but not, of course, that they were the same bills that Ms. Cohen had obtained from the bank). This man's conduct, in sitting at lunch for two hours after having passed two of the bills before wandering about Disney World carrying red balloons and then going to dinner and passing the last of the $50 bills, is all conduct that is just the opposite of what the courts have normally looked to to find proof of guilty knowledge. The ease with which John disposed of the first two $50's would naturally raise the question as to why he did not make some further purchase and cash the remaining bill and leave the park if he was trying to make a surreptitious getaway. There was here clearly no evidence of flight.

C. *Evidence against appellants.* One item of circumstantial evidence, suggesting guilty knowledge of Robert, Jr. is the fact that the three counterfeit bills passed by John on August 24, were paid by Robert to John for work performed under his direction on the Cohen car.

The Government contends that an item of circumstantial evidence against both Joan and Linda was the fact that when they, together with Cindy were stopped by the police on May 24, they separately told the police that the $50 bills they had passed had been obtained from Cindy, whereas they testified before the grand jury and later on their trial that the bills had been received from their respective husbands.

Circumstantial evidence against John Paul is the fact that he cashed the three $50 bills and ended the day with $90 in his pocket, so that it is clear that he cashed at least one $50 bill when he could as well have spent part of the proceeds from earlier cashing. He explained this by the fact that he wanted to cash the $50 bills, which he said were the first he had ever seen, because he could not cash them in his home town of Bithlo. There was the further

circumstantial evidence against John in that he testified that he had learned in April of his mother's trouble over her $50 bill.

D. *The family relationship.* Finally, there was the family relationship of the parties. So far as the substantive charges are concerned, it would, of course, be inadmissible for us to conclude that the mere fact that the persons were closely related would be sufficient to establish knowledge. The fact that three members of a family did, on different days, pass bills that were found to be counterfeit adds nothing of evidentiary value to the simple act of passing unless there was proof that the various members *knew* of the acts of the others. The fact of the close association of the several parties and their association with Robert, Sr. the father who was the source of four of the bills is, one circumstance from which the jury might infer knowledge.

So, too, as to the conspiracy charge, everyone knows that guilt of a conspiracy cannot be proven solely by family relationship or other type of close association. *Causey v. United States,* 352 F.2d 203 (5th Cir. 1965); *United States v. Tyler,* 505 F.2d 1329 (5th Cir. 1975); *United States v. Martinez,* 486 F.2d 15 (5th Cir. 1973); *and see United States v. Armone,* 363 F.2d 385 (2d Cir. 1966) in which the court said:

> "Membership in a conspiracy was not inferable merely because of family relationships . . . or because of friendship between alleged co-conspirators; the defendants could not be found guilty *by association* of violation of the conspiracy laws." [Emphasis added.]
> 363 F.2d at 388.

## CONCLUSION

The problem of determining whether a criminal case should be submitted to the jury when proper motions are made has frequently been discussed in this Court. We have recently discussed the cases that have established the rule that controls such a situation. *See United States v. Haggins* (1977), 5th Cir., 545 F.2d 1009. In *Haggins,*

we concluded that the rule in effect in this Circuit is that the case should not go to the jury if the trial court concludes that upon the evidence to be submitted, a reasonably-minded jury must necessarily have had a reasonable doubt as to the defendant's guilt. *See United States v. Nazien*, 504 F.2d 394 (5th Cir. 1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975).

This is not a strong case for the prosecution. Proof of knowledge must be, as is almost always the case, by inferences that may be presumably drawn from the proven facts. Here, we conclude that giving the evidence the weight to which it is entitled, we cannot determine that a jury must have entertained a reasonable doubt as to the guilt of appellants on the illegal passing counts. Furthermore, the evidence which supports this determination is sufficient to warrant submission of the conspiracy count to the jury.

REVERSED and REMANDED with directions.