IRVING, J,
for the Court.
¶ 1. Sinardo James Moffett was convicted by a jury of capital murder and sentenced by the Hinds County Circuit Court as a habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections. Aggrieved, Moffett appeals and asserts: (1) that the trial court erred in allowing his codefendant to testify when the State knew that the code-fendant would invoke his Fifth Amendment privilege against self-incrimination, (2) that he was denied effective assistance of counsel, (3) that the verdict was against the overwhelming weight of the evidence,[1] and (4) that the cumulative effect of errors at trial warrants a new trial.
¶ 2. Finding no reversible error, we affirm.
FACTS
¶ 3. During the early morning hours of July 21, 2003, officers of the Jackson Police Department found Germane Turner’s body in his sport utility vehicle (SUV) that was parked in Jayne Park in Jackson, Mississippi. It was later determined that Turner had died from a gunshot wound to the chest. On January 9, 2004, arrest warrants were obtained for Eric Robinson and Moffett. On April 6, 2004, Moffett and Robinson, who is Moffett’s brother-in-law, were indicted for Turner’s murder. Robinson entered into a plea agreement, *167 but Moffett went to trial and was convicted of capital murder.
¶ 4. Latisha Williams, Turner’s live-in girlfriend, testified at trial about the last time that she spoke to Turner.[2] Around 11:00 p.m. on July 20, 2003, Williams called Turner on his cellular telephone and asked him to bring home some milk. At approximately 3:00 a.m., Williams heard Turner’s vehicle pull into the driveway. Williams recalled that the vehicle ran for approximately ten to fifteen minutes before it pulled off. Williams stated that she thought that Turner had left to go to the store.
¶ 5. According to Williams, she waited a few minutes and then called Turner again on his cellular telephone. Turner did not answer. Williams then went to the kitchen, looked out of the window, and saw what appeared to be Turner’s clothing lying in the driveway. This discovery prompted Williams to take a closer look. Williams testified that she then went outside and confirmed that the clothing belonged to Turner. Williams called Turner again, and this time a man, who identified himself as Larry, answered. Williams testified that she asked the man where Turner was and that he told her that Turner had gone into a store. Williams called Turner’s telephone several more times, and the man who had identified himself as Larry, answered it each time. Williams continued calling Turner’s telephone, and eventually someone else answered. The person who answered this time informed Williams that Turner had gone into a store and had left his telephone in the car. Williams testified that she asked that person to tell Turner to call “Tasha.”[3] Williams testified that she continued to call Turner’s telephone but could not get anyone else to answer. Williams then called the police.
¶ 6. Officer Abraham Gerome Thompson with the JPD, testified that he responded to a missing-persons call during the early morning hours of July 21, 2003. Williams gave Officer Thompson Turner’s clothing that she had found in the driveway. Officer Thompson then called Turner’s cellular telephone, but he did not get an answer. Thereafter, Williams and Officer Thompson went outside. Shortly thereafter, Williams’s aunt told her that a lady who claimed to have found Turner’s telephone had called.
¶ 7. Officer Thompson noticed what appeared to be blood in the driveway. He also noticed that a shrub that was adjacent to the driveway had been trampled. Upon closer examination, Officer Thompson saw that the shrub had blood on it as well. Officer Thompson surmised that an altercation had occurred. According to Officer Thompson, the clothing that was recovered from the scene had dirt stains on it. Officer Thompson also recovered a gold necklace in the grass near the shrub, and a bag that contained a leafy green substance. On cross-examination, Officer Thompson stated that he did not know whether any DNA analysis was conducted because he turned the clothing over to officers with the Mobile Crime Lab.
¶ 8. Investigator Jeffrey Scott[4] arrived at Williams’s house to assist Officer Thompson. Investigator Scott testified that he observed small blood spatters in *168 the driveway and that Officer Thompson informed him that clothing had been recovered. Investigator Scott stated that he then took over the investigation. According to Investigator Scott, it appeared that Turner had been involved in a struggle. Investigator Scott also recalled that the clothing had grass and bloodstains on it. Investigator Scott conducted a walk-through of the crime scene and observed a plastic bottle lying in the driveway next to a pool of blood. He collected and secured the bottle and samples of the blood. Investigator Scott also stated that he was training James Chambers, a crime scene investigator with the JPD, and that it was Chambers who had collected the evidence. Investigator Scott was then advised that a SUV had been discovered in the parking lot of Jayne Park, which is located behind the JPD’s training academy. Investigator Scott arrived at the park and noticed Turner’s body in the back seat of the SUV. Turner was wearing only boxer underwear and tennis shoes.
¶ 9. On cross-examination, Investigator Scott testified that he documented the evidence, which included three cellular telephones, that was collected from the parking lot where Turner’s SUV was found. He noted that two of the telephones were found inside of the vehicle, and one was found outside of the vehicle. He testified that the telephones were not dusted for fingerprints. The defense pointed out that Investigator Scott had stated in his report that thirty latent prints were collected from the SUV and sent to the JPD’s identification unit for further analysis. Investigator Scott testified that he did not know what had happened to the prints after they were collected. It was also brought out that Investigator Scott collected blood from a stain on the rear passenger door and that he did not know whether it had been tested for DNA. Additionally, a blood-stained ten-dollar bill was found on the floorboard of the back seat, and a .380 shell casing was found underneath the driver’s seat. The shell casing was sent to the lab for fingerprint analysis. Investigator Scott also clarified his earlier testimony and stated that Turner’s body was actually found in between the front and back seats, not solely in the back seat as he had testified on direct.
¶ 10. Mary Ridley, supervisor of the JPD’s communication department, was also present at Williams’s residence during the early morning hours of July 21, 2003. She testified that she instructed the officers to investigate what was considered at that point to be a missing-persons case. Thereafter, an all-points bulletin was issued for Turner’s SUV. Officers then received a report that a lady, who would later be identified as Labertha Mosby, had found a cellular telephone while she walked on the track at Jayne Park. When JPD officer Shaun Terwilliger went to look for Mosby, he saw a Chevrolet Suburban matching the description of Turner’s SUV parked in the parking lot of the police training academy.[5] Officer Terwilliger found Mosby, and she turned the cellular telephone over to him.
¶ 11. Prior to going to Jayne Park, Investigator Chambers also assisted in the investigation at Williams’s residence. In large part, Investigator Chambers’s testimony mirrored Investigator Scott’s. Thus, we will briefly summarize Investiga *169 tor Chambers’s testimony as it relates to details not covered by Investigator Scott.
¶ 12. Investigator Chambers stated that he then went to the park and saw Turner’s nearly naked body lying on the back seat of Turner’s SUV. He also observed that the radio had been ripped out of the vehicle. Investigator Chambers testified that a projectile was recovered from the SUV.[6] Investigator Chambers also testified that he and another officer collected approximately thirty fingerprints from the vehicle; however, he stated that he did not know whether any of the prints were useable. On cross-examination, he stated that they packaged the cellular telephones and the latent prints that were recovered from the SUV. Investigator Chambers further stated that the telephones and prints were sent to the crime lab for testing.
¶ 13. The State also called Robinson as a witness; however, he pleaded the Fifth Amendment to essentially every question that he was asked. The judge informed Robinson that his refusal to testify constituted a violation of his plea agreement, and as a result, the court would be allowed to revisit his sentencing, which could result in his receiving an enhanced sentence. Thereafter, Moffett’s attorney moved for the court to instruct the jury that no inference was to be drawn from Robinson’s pleading the Fifth Amendment.
¶ 14. Detective James Roberts with the JPD, lead detective in this case, testified that he was dispatched to Jayne Park where he observed Turner’s body and concluded that Turner had been involved in a physical altercation prior to his death. Detective Roberts testified that he spoke with Williams and that she advised him to contact the Edwards Police Department. Detective Roberts went to the Edwards Police Department and spoke with Officer A.B. Roper who told him that Robinson may have been involved in Turner’s murder.[7] Detective Roberts then spoke with Robinson; however, Robinson did not admit to any involvement in the murder. Also, during the course of his investigation, Detective Roberts learned that a man named Rodrick Barnes had been with Mof-fett on the night that Turner was murdered.[8] Detective Roberts said that he then focused on Robinson and Moffett because Barnes informed him that Robinson and Moffett were present when the murder occurred.[9] Detective Roberts testified that he interviewed Moffett and that Mof-fett did not indicate that he was involved in Turner’s murder in any way.[10] Moffett, claimed that he had been at home on the night of the incident and that he had left *170 only for a brief period of time to meet his mother at the Masonic Temple.[11] Detective Roberts also stated that Moffett provided a written statement wherein he denied having any involvement in Turner’s death.[12]
¶ 15. Detective Roberts also recalled that fingerprints were recovered from Turner’s vehicle and that they were sent to the identification unit where they were processed. Detective Roberts stated that the prints were run through an automatic fingerprint comparison computer. Detective Roberts also stated that he requested that the prints be manually compared with Robinson’s and Moffett’s prints. However, according to Melvin Jones, a JPD fingerprint analyst who testified for the defense, none of the prints were a match for either Moffett, Robinson, or Barnes.
¶ 16. Robin Mosley, a friend of Turner’s, also testified on behalf of the State. Mosley stated that on the night of the murder, he and Turner had gone to Club Cartier (the club) and that they stayed for approximately four hours. Mosley also testified that he and Turner then went to Mosley’s home and smoked marijuana. Mosley recalled that Turner left at approximately 2:30 a.m.
¶ 17. On cross-examination, the defense pointed out that Mosley’s trial testimony, as it related to the time that Turner left his home, differed slightly from his written statement that he had provided on the night of the incident. The defense noted that in his written statement Mosley stated that he and Turner stayed at the club until almost 3:00 a.m. and that he and Turner then went to Mosley’s house, where they remained for another thirty minutes until Turner received a call from Williams.
¶ 18. Barnes, who prior to trial identified Moffett in a lineup, also testified on behalf of the State. Barnes stated that he met Moffett and Robinson at the club on the night of Turner’s murder. He had gone there with a friend.[13] According to Barnes, he left the club with Robinson and Moffett after Robinson asked him if he wanted to “ride with them and drink some beer.” Barnes testified that Turner drove past them in his SUV as they were riding around. Barnes stated that Robinson, the driver, turned his vehicle around and followed Turner. Barnes testified that they continued to follow Turner until Turner made it to Turner’s home, at which point Robinson and Moffett got out of their vehicle and attacked Turner, who had also exited his SUV. Barnes recalled that Robinson hit Turner a couple of times with a baseball bat and that Moffett hit him with a pistol. Barnes stated that Robinson and Moffett then removed Turner’s clothing, put Turner in the back of Turner’s SUV, and drove off with him. Robinson was driving and Moffett was sitting in the front seat. Barnes testified that he never saw Turner again, although Turner appeared to be alive when Robinson and Moffett drove off with him. At that point, Barnes ran away, but he came in contact with Robinson and Moffett again. When he encountered them, they were removing the speakers and a television from Turner’s SUV. Barnes stated that he was then *171 forced, at gunpoint, to get into the car with Robinson and Moffett.[14] They took Barnes to his home in Edwards after telling him that he would be killed if he told anyone what had transpired. Barnes stated that initially he did not tell anyone about what had happened because he feared for his life. However, Barnes eventually provided a written statement to the police on January 8, 2004.
¶ 19. Barnes was adamant that he saw Moffett, not Robinson, with a gun. Barnes testified that he did not witness the shooting and that Robinson never told him who had shot Turner. However, on cross-examination, Barnes testified that Robinson had admitted to him that Robinson was the shooter.
¶ 20. Dr. Steven Hayne, the last witness called by the State, testified that he performed an autopsy on Turner. Dr. Hayne recalled that Turner had several cuts, scrapes, scratches, and bruises on his face. Dr. Hayne also noted that Turner suffered multiple abrasions to his back, chest, arm, and leg. However, Dr. Hayne was clear that these injuries did not cause Turner’s death. Rather, he concluded that Turner died from a gunshot that struck him in the left chest cavity. Dr. Hayne testified that the shooter had been very close to Turner when the shot was fired, because there were unburnt fragments of gunpowder around the entrance wound. According to Dr. Hayne, the bullet entered Turner’s body on the left side of the chest wall and exited on the right side of the back.
¶ 21. The defense presented five witnesses: Melvin Jones, Kimela Moffett,[15] Mary, Shatequa Harrison, and Joseph Wilson. Kimela testified that Moffett left them residence at approximately 8:00 p.m. on Sunday, July 20, 2003, to see if his mom needed a ride home from the Masonic Temple. Kimela stated that Moffett returned approximately thirty minutes later and that he remained there for the rest of the night. Kimela testified that she talked on the telephone for a while before going to bed and that Moffett had already fallen asleep by the time she went to bed. Kime-la stated that, to her knowledge, Moffett did not leave their home the rest of the night.
¶ 22. Harrison, Moffett’s sister, testified that on July 20, 2003, she went to Moffett’s home at approximately 5:00 p.m. Harrison stated that she left Moffett’s home at approximately 11:30 p.m. and at that time, Moffett was lying in his bed. However, on cross-examination, Harrison admitted that she did not know whether Moffett left after she returned to her home.
¶ 23. Wilson testified that he had been at the Masonic Temple on the evening of July 20, 2003, and that he saw Moffett come in, speak with a lady, and immediately turn around and leave. Wilson stated that he then engaged the lady in conversation and that she informed him that Mof-fett was looking for Moffett’s mother. Wilson further testified that the lady told him that she had informed Moffett that his mother was not there because she was under the impression that Moffett’s mother had left with Wilson. According to *172 Wilson, he then went outside and tried to get Moffett’s attention, but Moffett did not see him.
¶ 24. At the conclusion of the evidence, the case was submitted to the jury, and Moffett was found guilty of capital murder and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Invocation of the Fifth Amendment by the Codefendant

¶ 25. Outside the presence of the jury, the State brought to the court’s attention that it had learned that Robinson had decided not to testify against Moffett, even though the previous week he had pleaded guilty to manslaughter and kidnapping in a plea agreement with the State that required him to testify fully and truthfully concerning Turner’s murder. The trial judge allowed the State to call Robinson to the stand as a hostile witness, and Robinson pleaded the Fifth Amendment to essentially every question that he was asked. The record reflects that Robinson even pleaded the Fifth Amendment when he was asked his name. He answered only one question, and that question was whether he had entered a guilty plea on September 26, 2006, in regard to the murder of Germane Turner. He answered that question in the affirmative, but he refused to even state what he pleaded guilty to. A review of the transcript does not reveal any questions that tended to implicate Moffett. On cross-examination, Robinson also refused to testify as to what his sentence was.
¶ 26. Moffett directs our attention to United States v. Beechum, 582 F.2d 898 (5th Cir.1978) and argues that the trial judge erred in allowing the State to call Robinson to the stand when the State knew that Robinson intended to plead the Fifth Amendment.
¶ 27. We find the facts in Beec-hum inapposite to our case. In Beechum, the defendant, Orange Jell Beechum, who was charged with unlawful possession of a valuable coin that he knew was stolen from the mail, took the witness stand and testified in his defense. While testifying on cross-examination, he repeatedly invoked the Fifth Amendment in an attempt to avoid answering the prosecutor’s questions about two credit cards, not belonging to him, that were found in his possession when he was arrested. Id. at 905. In finding that the Government was entitled to question Beechum about possession of the credit cards and that Beechum’s Fifth Amendment rights were not violated, the Beechum court, citing United States v. Ritz, 548 F.2d 510 (5th Cm.1977) and United States v. Maloney, 262 F.2d 535 (2d Cir.1959), observed that “[i]t is impermissi-bly prejudicial for the Government to attempt to influence the jury by calling a witness it knows will invoke the [Fjifth [Ajmendment.” Beechum, 582 F.2d at 908-09. Additionally, the Beechum court, citing United States v. Lacouture, 495 F.2d 1237 (5th Cir.1974), noted that “where the government witness indicates beforehand that he will invoke the privilege, the court may properly refuse to allow him to testify before the jury” but that the case before it was not such a case. Beechum, 582 F.2d at 909.
¶ 28. Here, Moffett did not testify. The person that invoked the Fifth Amendment, albeit without a legitimate basis, was a witness called by the State. The witness, Robinson, had waived his right against self-incrimination when he pleaded guilty the week prior to trial. Therefore, he could have been compelled to testify or *173 held in contempt for not during so.[16] Nevertheless, that did not happen. The State did not ask the court to compel Robinson to testify. Rather, the State asked permission to treat Robinson as a hostile witness. The court granted the request, and thereafter, the State asked several leading questions, to which Robinson pleaded the Fifth Amendment.
¶ 29. The purpose of prohibiting the State from calling a witness that the State knows will plead the Fifth Amendment is to prevent unfair prejudice from flowing inferentially to the defendant as a result of the witness’s refusal to answer the prosecutor’s questions. While the jury may presume what the answer would have been, the defendant is unable to cross-examine the witness on the presumed responses.
¶ 30. It is proper here to ask, preliminarily, whether the record supports the conclusion that the State intentionally sought an unfair advantage. We find nothing in the record to suggest that it did. After learning that Robinson was going to invoke the Fifth Amendment, the State made inquiry to the court concerning the proper procedure to follow. The court provided no guidance. While the court has no obligation to assist the State in the presentation of the State’s case, it does have an obligation to see that a defendant receives a fair trial. After the State received no guidance from the court, it asked permission to call Robinson as a hostile witness. It seems quite certain to us that the State knows that it cannot call as a hostile witness any witness who has a legitimate Fifth Amendment right not to testify. Therefore, the State’s asking permission to call Robinson as a hostile witness suggests that the State was simply befuddled about the situation that it found itself in as a result of Robinson’s sudden about-face, not that the State was seeking to gain an unfair advantage in its case against Moffett.
¶ 31. Since Robinson was improperly allowed to get away with not testifying, resulting presumably in the prejudicial inference discussed above, the question becomes did reversible error occur as a result of the process. We find that it did not. First, we note that Moffett’s attorney did not object to Robinson being called to the witness stand and being questioned in front of the jury. In fact Moffett’s attorney suggested that that was the proper procedure. Second, Moffett’s attorney cross-examined Robinson and attempted to elicit testimony beneficial to Moffett’s defense. For example, the record reflects the following exchange between Moffett’s attorney and Robinson:
Q. And in [the plea qualification] proceeding did you indicate that Mr. Moffett was not with you that night?
A. I plead the Fifth.
Third, we find that even in the absence of the prejudicial inference that may have been drawn by the jury from Robinson’s refusal to testify, there was other evidence that was sufficient to support the jury’s verdict. Barnes gave compelling and convincing evidence of Moffett’s guilt. He identified Moffett as a participant in a brutal attack on Turner which occurred just hours before Turner’s body was found with a bullet hole in the chest. Further, the body was found in Turner’s SUV *174 which, according to Barnes, was the vehicle that Moffett and Robinson placed Turner in and drove off in after the vicious assault. The killing was the only thing that Barnes did not witness. However, he provided enough evidence for a reasonable jury to conclude that Moffett and Robinson were the killers.
¶ 32. This issue is without merit.

2. Ineffective Assistance of Counsel

¶33. Moffett argues that he received ineffective assistance of counsel because his trial attorney did not object to the State’s calling Robinson to the stand. We cannot conclude that his counsel’s action constituted ineffective assistance of counsel. It is clear that Moffett’s attorney thought that she might be able to elicit testimony from Robinson that would be helpful to Moffett, and she had good reason to think so. Robinson and Moffett are brother-in-laws. The brief exchange between Moffett’s counsel and Robinson that is quoted above supports the notion that Moffett’s counsel thought Robinson just might testify that Moffett was not with him at the time that Turner was murdered. This issue lacks merit.

3. Sufficiency of the Evidence

¶ 34. In this issue, Moffett argues that the evidence is insufficient to sustain his conviction because (1) no fingerprints or DNA evidence connected him to Turner’s SUV, (2) the fingerprints that were recovered were not generally compared with the fingerprints in the Federal Bureau of Investigation’s National Crime Information Center (NCIC), (3) the officers failed to investigate his alibi, and (4) the State’s main witness did not witness the shooting.
¶ 35. In order to succeed on a challenge to the sufficiency of the evidence supporting his conviction, Moffett must prove that no “rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Smith v. State, 925 So.2d 825, 830(¶ 10) (Miss. 2006) (quoting Brown v. State, 907 So.2d 336, 339(¶ 8) (Miss.2005)). Challenges to the sufficiency of the evidence are viewed in the light most favorable to the State. Id. Therefore, we “must accept as true all evidence consistent with the defendant’s guilt, together with all favorable inferences that may be reasonably drawn from the evidence, and disregard the evidence favorable to the defendant.” Robinson v. State, 940 So.2d 235, 240(¶ 13) (Miss.2006) (citing McClain v. State, 625 So.2d 774, 778 (Miss.1993)). The trial court’s decision is reviewed under an abuse of discretion standard. Smith, 925 So.2d at 830(¶ 10) (citing Brown, 907 So.2d at 339(¶ 8)). “As long as ‘reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,’ [then] the evidence will be deemed to have been sufficient.” Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)).
¶ 36. We find Moffett’s first argument — that the evidence is insufficient to sustain his conviction because none of the fingerprints that were recovered from Turner’s SUV are a match for his — unpersuasive. There could be any number of reasons why there was no fingerprint match, but the failure to find a match does not, in the least, prove that Moffett did not commit the murder. Barnes’s testimony alone provided an ample evidentiary basis in support of the verdict.
¶ 37. As for Moffett’s argument that his fingerprints were not submitted for general comparison to all persons in the NCIC, we fail to see how this omission would have helped Moffett since his prints did not match any of the prints that were found. Apparently, Moffett’s reasoning is that had *175 a comparison been made, perhaps a match with some other person would have been found. Even so, that would not have exonerated Moffett based on the other evidence that was offered against him. Further, even if a match to some other person would have been found, that fact alone would not prove that that person committed the murder. We find no merit to this issue.
¶ 38. Moffett’s next argument, that the police did not investigate his alibi, is simply untrue. As previously stated, Detective Roberts interviewed Kimela, who testified that Moffett was at home with her when she retired for the night. Obviously, if the jury believed Kimela’s testimony, it also must have concluded that Moffett left their home at some point after she fell asleep. This issue lacks merit.
¶ 39. Moffett also argues that the State did not prove beyond a reasonable doubt that he was the shooter. Barnes provided a detailed account of what transpired on the night that Turner was murdered. Although Barnes conceded that he did not witness the shooting, we note that he testified that Robinson and Moffett: (1) inflicted a beating upon Turner prior to his death, (2) put Turner in the back of Turner’s SUV against his will, and (3) stole speakers and a television from Turner’s SUV. It is well settled that “when two or more persons act in concert, with a common design, in committing a crime of violence upon others, and a homicide committed by one of them is incident to the execution of the common design, both are criminally liable for the homicide.” Price v. State, 362 So.2d 204, 205 (Miss.1978) (citing McNeer v. State, 228 Miss. 308, 314, 87 So.2d 568, 570 (1956)). Therefore, even though Barnes did not identify Moffett as the shooter, that is of no consequence, as the jury obviously concluded that Robinson and Moffett acted in concert in committing a crime of violence which resulted in Turner’s death. There is no merit to this issue.
A Cumulative Error
¶ 40. Finally, Moffett contends that the cumulative effect of the alleged errors requires reversal. There is no merit to this issue, as we have found that the trial judge committed no error.
¶ 41. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. Moffett frames this issue in terms of the verdict being against the overwhelming weight of the evidence but makes a sufficiency argument in the body of the discussion. A "weight argument" implicates the propriety of granting a new trial, while a sufficiency argument challenges the propriety of the ver-diet, as well as the State's right to retry the case. Since it is clear from Moffett’s brief that his argument addresses the sufficiency of the evidence rather than the weight, we recast this issue as one of sufficiency of the evidence and will address it as such.

. Williams and Turner lived with Williams's aunt at the time that he was killed.

. It is not clear whether Williams was referring to herself, as the record indicates that her first name is Latisha, not Tasha.

.At the time of trial, Investigator Scott was sergeant over the JPD’s burglary unit; however, on July 21, 2003, he served as a crime scene investigator.

. Although Officer Terwilliger testified that the SUV was found in the parking lot of the police training academy, all other witnesses testified that the SUV was found at Jayne Park. Officer Terwilliger's testimony — that the SUV was found in the parking lot of the police academy rather than at Jayne Park— may be explained by the fact that a building identified as property of the academy is located in Jayne Park.

. The projectile was recovered after the SUV had been impounded.

. The State also called Officer Roper, a patrolman, to the stand, and he testified about an incident that occurred in mid-June 2003. Officer Roper stated that he was on patrol at a convenience store when he encountered a bloodied, tattered Robinson. Officer Roper stated that Robinson told him that Turner had “jumped on him.” Further, Officer Roper testified that Robinson declined to file a report against Turner. According to Officer Roper, Robinson did not provide any details about the attack, but he mentioned that a baseball bat had been involved.

. Turner, Moffett, Robinson, and Barnes are all originally from Edwards, Mississippi.

. Detective Roberts also testified that he began to suspect that Robinson was involved in the murder because he had learned that Robinson and Turner had been involved in a “prior negative incident.” On cross-examination, Detective Roberts admitted that he also had learned from an interview with a man named Nick Thompson that Barnes also had been involved in a “prior negative incident.”

. Moffett came voluntarily to the JPD after he learned that Detective Roberts had been asking about him.

.Mary Moffett, Moffett's mother, testified on behalf of the defense and agreed that she had attended a function at the Masonic Temple on the night of July 20, 2003; however, she stated that she left with an individual who had also attended the function. Mary stated that she did not see Moffett that night.

. Although mentioned throughout trial, the record before us does not contain any written or video-taped statements.

. Barnes was already at the club when Robinson and Moffett arrived.

. While it is not entirely clear in the record, it appears that the car was the same car that Barnes, Robinson, and Moffett had been riding in when Turner passed them.

. Kimela is Moffett's wife. In the trial transcript, her name is spelled Camella. However, the record contains a letter written by her wherein she signs her name Kimela. Thus, we assume that Kimela's name is misspelled in the transcript and will refer to her as Kimela.

. If an attempt had been made to compel Robinson's testimony, it should have occurred outside the presence of the jury. If Robinson still persisted in not testifying, he should not have been called to the witness stand. However, it would have been quite proper to send him to jail until he decided to testify because he had no Fifth Amendment right not to testify-