[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 19, 2010
JOHN LEY
CLERK

_____

No. 08-17178

_____

D. C. Docket No. 08-20270-CR-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SANDRA MATEOS,
ANA ALVAREZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 19, 2010)

Before  O'CONNOR, Associate Justice,[*] CARNES and ANDERSON, Circuit Judges.

O'CONNOR, Associate Justice (Ret.):

Dr. Ana Alvarez and Nurse Sandra Mateos were employees at St. Jude Rehabilitation Center during its brief time as an operating clinic in 2003.  St. Jude was ostensibly an HIV treatment center, but it was established as a front for a massive Medicare scam.  The fraud involved falsely diagnosing patients with a condition that would justify treatments of WinRho, an expensive drug reimbursable by Medicare at a rate of about $4,900 per treatment to St. Jude. Because the treatment was medically unnecessary, employees at St. Jude would purchase only a small fraction of the drugs and drug treatments for which they billed Medicare.  They would then use a simple saline solution or an extremely diluted dose of WinRho to inject patients, thereby pocketing much of the money that Medicare had paid for the WinRho treatments.  All of the patients were HIV-positive Medicare beneficiaries who had been recruited for the purpose of seeking WinRho treatments they did not actually need. The patients were typically paid about $150 per visit in exchange for their knowing participation.  During the

[*] Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court (Ret.), sitting by designation pursuant to 28 U.S.C. § 294(a).

approximately five-month span in which this scam continued, St. Jude received more than $8 million from Medicare.

For their roles in this operation, Dr. Alvarez and Nurse Mateos were indicted on several counts. Both Alvarez and Mateos were indicted for: (1) conspiracy to defraud the United States, to cause the submission of false claims, and to pay health care kickbacks, in violation of 18 U.S.C. § 371; and (2) conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 and 1349. While Mateos was charged with only those two counts, Alvarez faced three additional counts of (3–5) submission of false claims, in violation of 18 U.S.C. § 287. Mateos was convicted of both counts, and Alvarez was convicted of all five of her counts. Mateos was sentenced to 7 years' imprisonment, and Alvarez to 30 years' imprisonment.

On appeal, Alvarez and Mateos each raise various arguments challenging their convictions and sentences. We reject all but one of their arguments outright. The one meritorious argument is raised by Alvarez, who correctly contends that the district court improperly excluded a videotape containing exculpatory evidence. The surreptitious recording, made near the tail end of the clinic's operation, arguably showed coconspirators assuring Alvarez that there was no fraudulent scheme at St. Jude. We agree with Alvarez that the statement at issue in the tape

3

was potentially powerful exculpatory evidence because a conspirator's denial of the existence of Medicare fraud to Alvarez is certainly in tension with the theory that Alvarez was privy to the scheme. We also agree with Alvarez that the statement was not hearsay, contrary to the district court's ruling, because it was not being offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted."). That is, Alvarez was not seeking to prove through the statement that there was no fraud at St. Jude—a point that was repeatedly conceded during her own testimony—but that the behavior of concealing the scheme from her was inconsistent with the prosecution's theory that she had knowledge of the scam.

Nonetheless, the exclusion of this videotape was harmless error because it was duplicative of witness testimony discussing the exculpatory content of the videotape. Indeed, Alvarez's attorney stressed this testimony in his closing argument.

Because this lone error was harmless, we AFFIRM the convictions and sentences of both Alvarez and Mateos.

I

The fraud at St. Jude involved an extensive cast of characters. Aisa Perera and Mariela Rodriguez (M. Rodriguez) were the catalysts behind St. Jude's

4

creation. Perera approached M. Rodriguez in 2002 with an opportunity to work with her in starting up a new health care clinic. The two eventually decided the clinic should target Medicare patients. Perera then met with Rita Campos, who owned a medical billing company, to discuss the endeavor. Campos told her that Luis Benitez would be able to provide her with everything she needed to start a lucrative clinic treating HIV-positive patients. Perera then met with Benitez, and, as Campos indicated, he provided the money and personnel necessary to start the clinic.

St. Jude was one of eleven clinics funded and established by Luis Benitez and his brothers Carlos and Jose Benitez. They started their clinics for the purpose of committing Medicare fraud. Luis Benitez provided the start-up capital, nurses, and supplies, and he sent an individual named Thomas McKenzie to train St. Jude's medical personnel. McKenzie had trained the staff at many of the Benitez brothers' clinics. He had a medical degree from Guatemala but was not licensed to practice medicine in the United States. He instructed St. Jude's two doctors as to how they should document their patients' charts so that Medicare would pay for WinRho treatments. WinRho is generally used to treat HIV patients suffering from thrombocytopenia or idiopathic thrombocytopenic purpura (ITP), a condition marked by an abnormally low platelet count. Before St. Jude began operating,

5

McKenzie instructed the clinic's medical staff that the objective in filling out patient charts was to make the patient files compatible with a diagnosis of thrombocytopenia, and that bleeding disorders would justify the diagnosis even though a laboratory test would be necessary to confirm the condition.

The clinic employed two licensed doctors, Dr. Orestes Alvarez-Jacinto and his daughter, Appellant Ana Alvarez. During their careers, Alvarez-Jacinto specialized in gynecology, and Alvarez's field of expertise was endocrinology and internal medicine. Neither had significant experience treating HIV patients. McKenzie trained each of them to note bleeding disorders on their patients' charts so as to justify WinRho treatments.

Alvarez-Jacinto and Alvarez began seeing patients on the day that St. Jude opened. All of the patients were HIV-positive Medicare beneficiaries, but they were not seeking treatment in earnest; they, too, were in on the scam. The Benitez brothers recruited them to seek treatment at St. Jude, provided transportation to the clinic for those who needed it, and paid the patients kickbacks ranging from $150 to $300 per visit. While the patients were apparently coached to make generic complaints about bleeding disorders, Dr. Alvarez-Jacinto and Dr. Alvarez would prescribe WinRho even when patients neglected to complain of any relevant symptoms. Occasionally, McKenzie would review the patient charts prepared by

6

Alvarez, and if they failed to indicate a history of bleeding so as to support a thrombocytopenia diagnosis, he would instruct her to correct the charts, and she would comply.

An institution can only bill Medicare for treatments if it has a Medicare provider number. Because St. Jude did not have a provider number, Alvarez was enlisted to obtain one in her own name (Alvarez-Jacinto already had his own number). To obtain her provider number, Alvarez signed a form agreeing to comply with applicable laws and Medicare regulations and certifying that she would not "knowingly present or cause to be presented" false or fraudulent claims, nor submit claims "with deliberate ignorance or reckless disregard for their truth or falsity." All of St. Jude's claims were submitted under either Alvarez-Jacinto's or Alvarez's provider number. Rita Campos was in charge of billing Medicare for the treatments, a service she had provided for the Benitez brothers at their various clinics. She would help prepare what are known as "superbills" for the patients, each showing the same diagnosis code: 287.3, the Medicare billing code for thrombocytopenia. Either Alvarez or Alvarez-Jacinto would sign each of the superbills before it was sent to Medicare.

The nurses at St. Jude were charged with administering the treatments—typically an injection of saline solution or heavily diluted

WinRho—and with paying the patients their kickbacks with money they received from M. Rodriguez and Perera. The two nurses at St. Jude were both sent by the Benitez brothers: Appellant Mateos, who had once been married to Luis Benitez, and Carmen Gonzalez, a cousin of the Benitez brothers. Also working at the clinic were Angel Rodriguez (A. Rodriguez), a medical assistant who helped with the infusions, and Beatriz Delgado, a receptionist who was paid $8,000 per month for allowing her name to be listed as president on St. Jude's corporate papers.

St. Jude was an operating clinic for less than five months, from July 2003 to mid-November 2003. The doctors saw about 70 patients per week, and most of the patients came multiple times each week. Many of the patients were homeless or otherwise impoverished; some were "professional patients" who would sit for multiple treatments at as many clinics as were willing to pay them. Sometimes patients did not stay to receive an infusion of any sort, but were paid anyway. On several occasions patients got angry and loudly demanded more money, and these demands were loud enough to be heard throughout the small clinic, which was only about 1100 square feet.

All told, the clinic billed Medicare for about $11 million, and Medicare actually paid more than $8 million. Payment for bills submitted under the two doctors' provider numbers went directly into St. Jude's bank account. The doctors

8

received a fixed salary. Despite her lack of experience in HIV treatment, Dr. Alvarez was paid $4000 a week (later raised to $5000) for working three days per week at the clinic. For her role, Nurse Mateos was paid approximately $500 a week. The bulk of the money went to the Benitez brothers, who received 60 percent of the profits, and Perera and M. Rodriguez, who split the remainder.

The investigation into St. Jude began shortly after the clinic's opening. In mid-August 2003, Alvarez discussed her work at St. Jude with a colleague at her second place of employment, a legitimate clinic where Alvarez worked two days a week and was paid substantially less. The colleague became concerned and urged Alvarez to speak with the director of the legitimate clinic. The director in turn had Alvarez contact the F.B.I., which scheduled an interview with Alvarez.

Alvarez had her first meeting with F.B.I. agents on August 27, 2003. One of the agents present at this first interview was Special Agent Thomas Adams. Alvarez told the agents that she was concerned about the tax consequences of the clinic billing under her provider number, and that she had heard that patients might be getting paid. Alvarez concealed much of her own involvement in the fraud, though, hiding the fact that she was prescribing medically unnecessary treatments and fraudulently billing Medicare for the treatments. The agents asked her about the infusion treatments she prescribed at St. Jude and showed her Medicare's Local

9

Medical Review Policy. The Policy stated that WinRho was only approved for treating patients with platelet counts below 30,000 per microliter of blood, and was not an appropriate treatment for any other medical condition. None of Alvarez's patients were anywhere near that benchmark, as the lowest recorded platelet count for any of her patients was 90,000 per microliter of blood. Although Alvarez claimed that the FBI encouraged her to stay at St. Jude during the rest of her tenure there, Agent Adams testified that he gave her no such advice. Even after the agents showed her Medicare's Local Medical Review Policy indicating that it was not medically appropriate, Alvarez continued to prescribe WinRho infusions to patients at St. Jude until she quit in November 2003.

Alvarez told the agents that she wanted to quit the clinic on November 14, 2003. Agent Adams asked her to stay a few more days so that the agents would have time to set up a covert recording of her conversation. Agent Adams testified that his aims in making the recording were twofold: to obtain incriminating statements from Perera and M. Rodriguez, and to evaluate the credibility and possible involvement of Alvarez and Alvarez-Jacinto in the fraud. Alvarez agreed to make the recording, and on November 17, 2003, she went to the clinic wearing a microphone and carrying a concealed video camera in her purse. In the recorded conversation, Alvarez and her father told Perera and M. Rodriguez that they were

10

worried about the amount of money being billed under their provider numbers, and Alvarez announced her intention to quit. At one point during the conversation, Perera said, "there's no fraud whatsoever here, doctor," but it is not clear what prompted that statement. Alvarez and Alvarez-Jacinto then quit working at the clinic. Without any doctors and without a provider number, St. Jude could no longer bill Medicare and had to suspend its operations.

After St. Jude closed its doors, the investigation progressed slowly as federal authorities first turned their attention to other Benitez clinics. The first charge specifically related to St. Jude did not come until mid-2007, when Alvarez-Jacinto pled guilty to a single count of conspiracy to commit health care fraud. He was sentenced to only 18 months of imprisonment after the sentencing judge granted him a downward variance on account of his advanced age and poor health. Rita Campos pled guilty in 2007 to one count of conspiracy to commit health care fraud and one count of submitting false claims. She initially received a sentence of 120 months, but her sentence was later reduced to 48 months after the government moved for a Rule 35(b) sentence reduction on account of her substantial assistance. Fed. R. Crim. Pro. 35(b). In May 2008, the three Benitez brothers and Thomas McKenzie were indicted on numerous counts involving fraud at eleven different HIV-treatment clinics (including St. Jude). The Benitez brothers fled the country,

11

and McKenzie pled guilty to one count of conspiracy to commit health care fraud and one count of submitting false claims. McKenzie was initially sentenced to 168 months, but his sentence was reduced to 95 months based on the government's Rule 35(b) motion.

The particular proceeding below began with the indictment of seven individuals: Ana Alvarez, Sandra Mateos, Aisa Perera, Mariela Rodriguez, Beatriz Delgado, Angel Rodriguez, and Carmen Gonzales. Gonzales skipped bail and disappeared before trial. Perera and M. Rodriguez pled guilty and, after initially receiving sentences of 30 months and 70 months respectively, each was ultimately sentenced to 24 months of imprisonment after the government's Rule 35(b) motions for sentence reductions. Four defendants proceeded to a joint trial: Alvarez, Mateos, Delgado, and A. Rodriguez.

At trial, the government's basic theory was that the fraud at St. Jude was so transparent and so flagrant that it would have been impossible for any employee not to have known what was going on. The government's witnesses included Perera, M. Rodriguez, McKenzie, Agent Adams, and Dr. Michael Wohlfeiler, an expert witness who testified that among approximately 2,500 HIV-positive patients he was treating in his own practice, he had not seen a single case within the last ten years where a patient's platelet level was low enough to require treatment with

12

WinRho. He also testified that if a patient actually needed a drug like WinRho, it would be given once every several weeks and only after careful monitoring, whereas the patients at St. Jude would receive infusions several times a week. Wohlfeiler also testified that WinRho could have potentially harmful side effects ranging from allergic reactions to kidney failure and death. He noted that this information was easily available both in the Physician's Desk Reference, a standard reference book typically found in any doctor's office and available online, and in the manufacturer's product information sheet that was packaged with each vial of the drug.

Each of the four defendants conceded that St. Jude was a fraudulent operation, but claimed that they themselves were unaware of the fraud during their employment because they had been duped by Perera, M. Rodriguez, and McKenzie.

Alvarez testified in her own defense. She said that she relied on McKenzie's instructions because she thought he was an expert in treating HIV; she claimed to have no idea that the WinRho infusions were medically unnecessary. She denied any knowledge of the billing fraud, and said she was unaware that the code 287.3, which appeared on all the superbills she signed, was the billing code for thrombocytopenia. Alvarez also relied heavily on her contacts with the F.B.I. as

13

evidence that she had no knowledge of the scheme, and argued that any criminal activity taken after her first meeting with F.B.I. agents was at their behest because they urged her to continue working at the clinic, a claim which Agent Adams denied in his testimony.

During the government's cross-examination, Alvarez conceded that WinRho was medically unnecessary for her patients, but asserted that she did not know as much during her time at St. Jude because she trusted McKenzie. She also testified that she never consulted the Physicians Desk Reference or looked at WinRho's product insert before prescribing hundreds of doses of the drug. She claimed that she did not become aware until shortly before trial that Medicare's Local Medical Review Policy dictated that WinRho was not appropriate unless a patient had a platelet count below 30,000 per microliter of blood. Agent Adams's testimony again contradicted her on this point, as he testified that the agents had shown her the Policy at their first meeting.

At several points during the trial, including during her own testimony, Alvarez sought to admit the surreptitiously recorded videotape of her resignation, during which Perera appears to assure Dr. Alvarez and Dr. Alvarez-Jacinto that there was no fraud occurring at St. Jude. The government objected to the tape's admission, citing hearsay concerns. Alvarez countered that the exculpatory

statements were not hearsay at all; Perera's assurances that there was no fraud at St. Jude were clearly false, and Alvarez sought to admit them not for their truth, but as circumstantial evidence that Alvarez was not privy to the scheme at St. Jude. Alternatively, Alvarez argued that the comments in the tape could be admitted as coconspirator statements, *see* Fed. R. Evid. 801(d)(2)(E), or as fitting within the "state of mind" exception to the rule against hearsay, *see* Fed. R. Evid. 803(3). The judge sustained the government's objections and excluded the videotape. However, some of the tape's content was admitted into evidence through witness testimony. During cross-examination of M. Rodriguez, the following exchange occurred:

Q: Now, at the time that Dr. Ana Alvarez came and questioned you and Aisa, back on November 17, 2003, do you recall that date?

A: Yes.

. . . .

Q: Dr. Alvarez was there, Angel Rodriguez was there, you were there, Aisa Perera was there and Dr. Orestes [Alvarez-]Jacinto was there, correct?

A: That is correct.

Q: At that time, the doctors confronted you and Aisa about what was going on at the clinic, correct?

A: Yes.

. . . .

Q: At that time, you and Aisa told the doctors and Mr. Angel Rodriguez that there was no fraud going on at the clinic whatsoever, isn't that true?

A: We told the doctors, actually Angel wasn't even part of that conversation. It was very little what he said.

Q: Let me rephrase my question. . . . Did you and Aisa tell the doctors that there was no fraud going on whatsoever at the clinic, yes or no?

A: Okay. Well, there is one issue on that conversation, where I do specify to Dr. Orestes Alvarez-Jacinto because he does emphasize us on using his [provider] number somewhere else on another office and I did tell him there, that we are not doing fraud with your number, nowhere else. That's what I meant. That's what he was talking about.

Q: Aisa Perera says, "there's no fraud going on at this clinic whatsoever doctor," does she not?

A: She did say that.

Doc. 317:934–35. Counsel for Alvarez stressed this exchange during his closing argument.

Mateos did not testify, but her defense theory was that she was but a lowly employee at St. Jude with no knowledge of the fraud. Her defense focused on the fact that her salary was only $500 a week, a measly sum for somebody participating in such a large-scale fraud in which the ringleaders were pocketing millions of dollars. She also filed a pre-trial motion seeking to prevent the government from making any mention of her prior marriage to Luis Benitez on the basis that such evidence would be overly prejudicial. *See* Fed. R. Evid. 403. The district court denied the motion, and the government mentioned the close

16

relationship between Mateos and L. Benitez on several occasions during the trial to combat Mateos's claimed ignorance about the fraud.

The jury convicted Alvarez and Mateos on all counts, and acquitted Delgado and A. Rodriguez on all counts.

At sentencing, Alvarez faced a statutory maximum of 30 years' imprisonment. The Presentence Report began the calculation of Alvarez's guidelines sentencing range with a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2), because the offense was one involving fraud. Added to that base offense level were twenty levels under § 2B1.1(b)(1) because the loss amount was between $7 million and $10 million; two levels under § 2B1.1(b)(9)(C) because the offense involved sophisticated means; two levels under § 2B1.1(b)(13)(A) because the offense involved conscious or reckless risk of death or serious bodily injury; three levels under § 3B1.1(b) for Alvarez's managerial role in an offense involving more than five participants; and two levels under § 3B1.3 for abuse of a position of trust. Alvarez's PSR calculated a Guidelines range of 168 to 210 months' imprisonment. The district court's acceptance of the enhancements and the addition of two levels under § 3C1.1 for obstruction of justice for delivering perjured testimony at trial produced an adjusted offense level of 37. Alvarez objected to the obstruction enhancement and offered the results of three polygraph

17

examinations she had commissioned to support her claim that she had been unaware of the fraud at St. Jude while working there. The first two polygraphs came back "inconclusive," but the third determined that she was answering truthfully during the following exchange:

Q: Prior to talking with FBI agents, did you know that anyone from St. Jude planned to send fraudulent bills to the U.S. Government?

A: No.

Q: Prior to talking with FBI agents, did you agree with anyone who was working at St. Jude to participate in a fraudulent scheme to collect money from the U.S. Government?

A: No.

The district court was unmoved by the polygraphs, explaining that it was basing its finding of perjury on its own assessment of Alvarez's trial testimony.

With the obstruction enhancement, Alvarez's Guidelines range was 216 to 262 months, and the government recommended a sentence of 262 months. The court considered the sentencing factors provided in 18 U.S.C. § 3553(a) at some length, and concluded that the seriousness of the crime, the position of trust Alvarez held as a doctor, and the need to deter the growing number of people committing Medicare fraud all warranted a sentence above the Guidelines range. The court sentenced Alvarez to the statutory maximum on each count, running each sentence consecutively, for a total prison term of thirty years. The court also

18

imposed three years' supervised release, restitution of $8,289,286 to be paid to the United States government, and forfeiture of various assets.

Mateos faced a statutory maximum of 15 years of imprisonment. Her PSR calculated her Guidelines range as 97 to 121 months, and included two enhancements that Mateos objected to at sentencing. The first was a twenty-level enhancement because the amount of loss caused by the fraud was more than $9 million. *See* U.S.S.G. § 2B1.1(b)(1)(K) (twenty-level enhancement if the loss was between $7 million and $20 million). Mateos argued that she should not be held responsible for the full amount because her role in the conspiracy was extremely limited, and the district court should have calculated the loss directly attributable to her behavior. She also objected to an enhancement under U.S.S.G. § 2B1.1(b)(13)(A), which applies to offenses involving "conscious or reckless risk of death or serious bodily injury," claiming that there was no evidence that she knew giving saline or diluted WinRho treatments could be harmful. The district court rejected both arguments. Mateos's Guidelines range was 78 to 97 months, and the court sentenced her to 84 months' imprisonment. It also imposed three years of supervised release and ordered Mateos to pay restitution to the United States government in the amount of $8,289,286.

Alvarez and Mateos now challenge their convictions and sentences on appeal.

II

Both Alvarez and Mateos challenge the sufficiency of the evidence supporting their convictions. Alvarez contends that there was insufficient evidence to convict her of any of her five charges. Mateos concedes there was sufficient evidence to convict her of paying kickbacks under count 1 of the indictment, *see* 18 U.S.C. § 371, and challenges only the more serious conviction for health care fraud conspiracy under 18 U.S.C. §§ 1347 and 1349.

When considering a sufficiency challenge, we view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences and resolve all credibility determinations in favor of the government. *United States v. Ellisor*, 522 F.3d 1255, 1271 (11th Cir. 2008). "[I]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008) (citation omitted). We consider each of their challenges in turn.

*A. Alvarez*

Alvarez argues that the evidence was insufficient to support her convictions on all counts. With regard to the conspiracy counts (counts 1 and 2), Alvarez concedes that the government proved that a conspiracy to commit healthcare fraud existed at St. Jude, but she claims that none of the evidence established that she knowingly participated. In particular, she argues that the evidence showed that she: (1) was recruited by her father and not by Benitez, (2) was not involved in the billing process and never saw the Medicare checks, (3) never paid kickbacks, and (4) merely followed McKenzie's instructions. With regard to the submission of false claims counts (counts 3–5), Alvarez concedes that the three superbills she signed were false but argues that there was no evidence that she knew they were false when she signed them.

The circumstantial evidence that Alvarez was privy to the scheme at St. Jude is sufficient to support her convictions. She was trained by McKenzie to document each patient's chart in the same manner; she altered the charts when instructed; she was informed by Agent Adams at her first meeting with the F.B.I. that her patients did not qualify for WinRho treatments; she was present when patients at St. Jude screamed about wanting more money; and the billing code number on the Medicare superbills she signed was always the same, regardless of what the patient charts said. While it is hypothetically possible that a person under

21

these circumstances could have been ignorant of the fraud, the jury was entitled to draw the reasonable inference from this evidence that Alvarez was in on the scheme. "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006) (citation omitted). Likewise, "[a] conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to [her]." *United States v. Figueroa*, 720 F.3d 1239, 1246 (11th Cir. 1983).

Even putting the government's affirmative case aside, Alvarez's own testimony greatly undermines her sufficiency argument. A defendant who chooses to testify runs the risk that the jury will disbelieve her testimony, and "runs the risk that if disbelieved the jury might conclude the opposite of [her] testimony is true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (citation omitted); *see also United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) (same). This is especially so in cases, such as the one at bar, that turn mainly on subjective elements, like a defendant's intent or knowledge. *Brown,* 53 F.3d at 315. When Alvarez insisted that she did not know that the procedures she prescribed were

22

medically unnecessary, or that the bills she signed were being doctored to obtain payment from Medicare, the jury was entitled to conclude that she was lying, and we must accept that credibility determination. The evidence was sufficient for a reasonable jury to find Alvarez guilty beyond a reasonable doubt on all counts.

*B. Mateos*

Mateos argues that the evidence failed to show that she knew that St. Jude was submitting fraudulent claims to Medicare. In particular, she claims that she (1) had no access to the clinic's accounts, (2) played no role in the billing process, (3) was not paid based on the clinic's earnings, (4) merely provided the patients with treatment the doctors prescribed, and (5) had no knowledge that Medicare may have been billed for services not actually provided. Mateos also places a great deal of weight on the fact that, in rejecting her motion for judgment of acquittal, the district court described the evidence against her as "weak."

While we agree with the district court that the evidence against Mateos was not overwhelming, it was sufficient to support the jury's guilty verdicts. The evidence showed that Mateos was recruited by the Benitez brothers to work as an infusionist at St. Jude and to pay kickbacks to the patients, which she did. In addition, Mateos provided patient care and administered the treatments of diluted WinRho and saline, leading to the reasonable inference that she knew the

23

treatments the patients were receiving were all the same and that she knew there was not enough medication on hand to administer the thousands of doses that the charts indicated were being administered. There was also evidence that she paid some patients who did not even receive treatment, which lends strong support to an inference that she knew any billing for those patients was fraudulent.

Mateos counters that her role was similar to the secretary's role in *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007), a case in which this Court reversed the conviction of a secretary who was involved in paying kickbacks to patients because the evidence was insufficient to establish that she knew the clinic was providing medically unnecessary services or fraudulently billing Medicare. *Id.* at 1297–1300. But unlike the secretary in *Medina*, Mateos both paid the patients and administered the treatments. It was not necessary for Mateos to know "all the details" of how the fraud worked in order for her to be guilty of the conspiracy. *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994). Mateos was not a mere secretary. She was a licensed nurse and had been trained as a doctor in her native Cuba. In light of her medical expertise, the circumstances of the fraud going on around her were so obvious that knowledge of it can fairly be attributed to her. Because Mateos was one of only three people who worked in the infusion room, and one of only two nurses who were responsible for mixing the correct

24

quantity of the drug into saline solution for intravenous infusion, the jury could reasonably infer her awareness of the discrepancy between the amounts of WinRho prescribed and the amounts actually given. Mateos, like anyone else in the cramped clinic quarters, also could not have avoided overhearing patients screaming that someone was getting rich with their Medicare number. The presence of fraud at St. Jude was so obvious that, as with Alvarez, Mateos's knowledge of its character could fairly be attributed to her. *See Figueroa*, 720 F.3d at 1246.

III

Alvarez and Mateos each raise one claim of evidentiary error. Alvarez argues that the district court erred when it excluded a videotape showing Perera assuring her and her father that there was no fraud occurring at St. Jude, and Mateos argues that the district court erred when it denied her motion to exclude any mention of her past marriage to Luis Benitez.

*A. The videotape*

At trial, Alvarez argued that the surreptitiously recorded videotape of her resignation was strong exculpatory evidence. In particular, Perera's statement that, "there's no fraud whatsoever here, doctor," showed that Alvarez was not privy to the fraudulent scheme. The government objected to the tape's admission on the

25

basis that it was hearsay, and the district court sustained the objection and excluded the videotape from evidence.

The district court erred when it excluded the videotape. The relevant comment on the tape was not hearsay at all because it was not being offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Alvarez sought to admit the statement not as evidence that there was no fraud at St. Jude, a point which no defendant contested, but as evidence that she did not know of the fraud. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c), Advisory Committee's Note; *see also* 5 J. Weinstein and M. Berger, Weinstein's Federal Evidence § 801.10(2)(c) (2d ed. 2008) ("Sometimes the relevance of words or actions to show a particular fact depends on drawing an inference that a person would not have spoken or acted in a certain way unless the person believed a certain fact to be true.").

The government's response to this reasoning tracks the exact error the district court made in excluding the tape: it argues that the comment does not qualify as a coconspirator statement under Fed. R. Evid. 801(d)(2)(E), and does not fit within the "state of mind" exception in Fed. R. Evid. 803(c). These responses are totally inapposite. If the statement is not hearsay in the first place, there is no

need for it to fit within an exception to the rule against hearsay. *Cf.* Fed. R. Evid. 402 (establishing presumption that all relevant evidence is admissible). Just as the district court did, the government focuses on the fact that the statements do not fit within an exception to the rule against hearsay, thereby skipping over the prior and all-important question of whether the statement was hearsay at all.

While the district court erred in excluding the relevant portion of the videotape, the error was harmless because the exculpatory content of the tape was effectively admitted through witness testimony. *See Kotteakos v. United States*, 328 U.S. 750, 764 (1946) ("If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . ."). In this case, the only exculpatory statement in the videotape that Alvarez relies on is Perera's statement that there was no fraud going on at St. Jude—a statement that was admitted during the cross-examination of M. Rodriguez. Alvarez's attorney even attempted to capitalize on this point during his closing argument, without interruption from the government or the district court.[1] The jury was simply unconvinced that Perera's denial established that Alvarez did

---

1 During closing argument, Alvarez's counsel stated: "They'd like to forget the part about when confronted with the fraud, how Mariela [Rodriguez] reacts. Mariela says, there is no fraud. Mariela and Aisa [Perera] go running to the Benitez brothers. The doctors discovered the fraud, what do we do? Benitez brothers say, offer them more money. What happens when the doctors discover the fraud? They have to close down the clinic." Doc. 319:1578. In this excerpt, Alvarez's counsel mistakenly attributes the statement to M. Rodriguez, when it was actually made by Perera (though it came into evidence during cross-examination of M. Rodriguez).

27

not know of the conspiracy. Because the only exculpatory statement on the tape was admitted into evidence through other means, the erroneous exclusion of the tape was harmless error.

### B. *Mateos's past marriage to Luis Benitez*

Over Mateos's objection, the district court allowed government witnesses to mention that she was once married to Luis Benitez, whom the prosecutor referred to as the "Godfather" of St. Jude. The district court found that the evidence was relevant because it suggested that Mateos was somebody who Luis Benitez would trust, but it gave the jury a limiting instruction, which stated that "the mere fact that certain persons may have associated with each other" does not by itself establish a conspiracy. On appeal, Mateos does not dispute the relevance of her relationship with Benitez. *See United States v. Ritz*, 548 F.2d 510, 522 (5th Cir. 1977) ("The fact of the close association of the [defendants is] . . . one circumstance from which the jury might infer knowledge" of a conspiracy.). She instead argues that the district court abused its discretion in admitting evidence of her relationship with Luis Benitez because it was substantially more prejudicial than its minimal probative value, *see* Fed. R. Evid. 403, and the prejudice was not adequately curbed by the limiting instruction.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "Because a trial court has broad discretion to determine the admissibility of evidence," this Court reviews evidentiary rulings for an abuse of discretion. *Ellisor*, 522 F.3d at 1266 n.12. Moreover, a limiting instruction may be sufficient to cure the risk of undue prejudice in limited circumstances. *See United States v. Hand*s, 184 F.3d 1322, 1329 (11th Cir. 1999).

Here, the district court did not abuse its discretion by refusing to exclude evidence that Luis Benitez was Mateos's ex-husband. The evidence was relevant to the issue of her guilt, *Ritz*, 548 F.2d at 522, and it posed little threat of undue prejudice. The concept expressed in the limiting instruction, that people should not be adjudged guilty based on their past or present relationships, is a simple one that the jury could easily understand and take to heart.

Mateos's reliance on *Hands*, 184 F.3d 1329, is misplaced. In *Hands*, this Court found reversible error when the district court allowed the government to impeach a testifying defendant with evidence that he had beaten his wife. *Id.* at 1325. Because the evidence of spousal abuse had nothing to do with the drug

29

conspiracy for which the husband was on trial, we held that its minimal probative value in impeaching the defendant was outweighed by its prejudicial impact. *Id.* at 1328–29. *Hands* is not similar to this case. Unlike the violent spousal abuse in that case, there is nothing visceral or inflammatory about the fact that Mateos was previously married to Benitez. It simply suggests that the organizers of the conspiracy were likely to trust Mateos, and it increases the likelihood that she knew what was going on at St. Jude. And it certainly was not inflammatory to such an extent that the district court's limiting instruction would not have been effective.

The district court did not abuse its discretion in concluding that the prejudicial impact of this evidence did not substantially outweigh its probative value.

IV

The five remaining claims of error all target the sentencing phase of the proceedings below. Alvarez raises three claims: (1) that her sentence was substantively unreasonable; (2) that the district court erred when it refused to consider the results of her polygraph examination at sentencing; and (3) that the district court's restitution order was unlawful because the United States is not a "person" who can be a "victim" owed restitution under the Mandatory Victim

30

Restitution Act of 1996 (MVRA).  Mateos raises two claims of error: (1) that the district court erred by attributing the entire intended loss of the conspiracy to her when calculating her Guidelines range; and (2) that the district court erred when it enhanced her Guidelines range based on its finding that her offense involved a conscious or reckless risk of death or serious bodily injury.  We consider each argument.

### A.  The reasonableness of Alvarez's sentence

We review the reasonableness of the district court's sentencing decision for an abuse of discretion.  *Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Irey*, 612 F.3d 1160, 1188–89 (11th Cir. 2010) (en banc).  "[A] district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications."  *Gall*, 552 U.S. at 46.  We will not invalidate a sentence unless we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *Irey*, 612 F.3d at 1190 (quoting *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008)).

The district court sentenced Alvarez to the statutory maximum, imposing the maximum penalty on each count and then running all counts consecutively. Her thirty-year sentence exceeds the top of the Guidelines range (262 months) by slightly more than eight years. Because of the deviation from the Guidelines, the district court was required to provide "sufficiently compelling" justifications to support the degree of the variance. *Gall*, 552 U.S. at 50; *Irey*, 612 F.3d at 1187. Nevertheless, this Court reviews all sentences (whether below, within, or above the Guidelines range) under the same deferential abuse of discretion standard, and it may not presume that a sentence outside of the Guidelines range is unreasonable. *Gall*, 552 U.S. at 51; *Irey*, 612 F.3d at 1187.

Here, the district court did not abuse its discretion by varying upward from the Guidelines range and sentencing Alvarez to a total of 360 months' imprisonment. The court provided specific reasons to justify its deviation from the Guidelines range, including: (1) a doctor should be punished more severely than other participants because the doctor is breaching a position of trust and an ethical obligation to put the patient's interest first; (2) the crime was not a fleeting moment, but a sustained conspiracy over a period of months; (3) Alvarez followed a lower standard of care with regard to the health of the HIV-positive patients as compared to her prior patients; and (4) there was a need to promote adequate

32

deterrence of Medicare fraud because it was becoming rampant in the Miami area and the risk of getting caught was fairly low. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that deterrence is an especially important element to consider during sentencing for fraud-based crimes because of their thought-out nature).

In addition to those four reasons, the district court added two other significant ones. First, it found that Alvarez had "blatantly lied" during her testimony at trial, Doc. 312:7, referring to her "perjurious testimony" as a reason to impose a harsh sentence. *See* Doc. 312:93 ("[T]aking into consideration her criminal conduct, her background, the need to deter Medicare fraud, her position as a doctor, as a leader in this criminal enterprise, her perjurious testimony, the combination of all those factors leads me to a sentence above the guidelines."); Doc. 299:1 (Order Denying Emergency Motion to Correct Sentence) ("The variance resulted in a reasonable sentence, because the defendant, as a licensed medical doctor, prescribed to HIV patients medically unnecessary treatment with potential harmful effects on these vulnerable patients. This along with her perjurious testimony during trial, her lack of remorse, and the extent and sophistication of the fraud justified the sentence.").

Second, the court focused on Alvarez's "lack of remorse," which Alvarez did not and could not dispute in light of her unwavering assertions of innocence even after her conviction. Doc. 299:1; *see also* Doc. 312:37 ("THE COURT: . . . We have an individual who has shown no remorse, agreed, because she doesn't think she did anything wrong . . . —true? [Counsel for Alvarez]: True."); Doc. 312:79 (stating that a "big factor" in the sentence imposed was that Alvarez had "no acceptance of responsibility whatsoever" and "[n]o remorse"). It was reasonable for the district court to consider those two factors, which support the differences between her sentence and those of her coconspirators, most of whom accepted responsibility, pleaded guilty, and cooperated.

It is true that Alvarez's 360-month sentence amounted to a significant variance and exceeded the sentences of her coconspirators (some of whom were the undisputed ringleaders of the operation), and that 18 U.S.C. § 3553(a)(6) instructs a district court to take such disparities into account when imposing a sentence. But the court based this difference, in part, on Alvarez's status as a doctor and her leadership role in the offense, a designation that Alvarez does not challenge on appeal. This finding is entitled to due deference.

To be sure, it is troubling that some coconspirators who were more deeply involved in the fraudulent scheme orchestrated by the Benitez brothers received

34

only a fraction of the sentence that Alvarez did. McKenzie received 95 months; Campos, 48 months; Perera and M. Rodriguez, 24 months each. All four of those coconspirators, however, provided the government with substantial assistance, and Campos, Perera, and M. Rodriguez entered guilty pleas. This Court has held that "there is no unwarranted disparity when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial." *United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009); *see also United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009); *United States v. Williams*, 526 F.3d 1312, 1323-24 (11th Cir. 2008).

The sentencing disparities in the present case are not unwarranted. In addition to pleading guilty and cooperating with the government, only one of the apparently comparable coconspirators was, like Alvarez, a medical doctor licensed to practice in the United States. That coconspirator was Alvarez's father, but at sentencing he was 81 years old and suffered from heart disease, impaired lung function requiring use of an oxygen mask, degenerative back disease, and what appeared to be either Alzheimer's or some other form of dementia. Furthermore, the district court relied not only on Alvarez's abuse of trust in her position as a doctor but also focused on the potential harmful effects that her conduct had on her patients. Finally, unlike her, none of Alvarez's coconspirators went to trial, none

35

testified, none committed perjury, and none displayed an utter and total lack of remorse from the beginning through the end of the proceedings.

Although the sentencing disparities are a concern, the district court gave many compelling reasons justifying its departure from the Guidelines, and it is within that court's discretion to decide how much weight to give each of the § 3553 factors as long as it has not committed a clear error of judgment. *See United States v. McBride*, 511 F.3d 1293, 1297–98 (11th Cir. 2007) (per curiam); *Irey*, 612 F.3d at 1191 ("A district court's sentence need not be the most appropriate one, it need only be a reasonable one. We may set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence imposed truly is unreasonable.").

Furthermore, Congress has recently amended the Guidelines to ensure that health care fraud is punished more severely. In health care reform legislation enacted in March 2010, Congress directed the Sentencing Commission to amend U.S.S.G. § 2B1.1 by adding a specific offense enhancement for "a Federal health care offense relating to a Government health care program" that involves $1 million or more. Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, § 10606(a)(2)(C), 124 Stat. 119, 1006–07 (March 23, 2010). If the loss amount is between $1 million and $7 million, 2 levels are added; if it is between $7

million and $20 million, as it was in this case, 3 levels are added; and if it is $20 million or more, 4 levels are added. *Id.* Congress also directed the Sentencing Commission to review the Guidelines and policy statements for health care fraud offenses to ensure that they "reflect the serious harms associated with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud" and to provide "increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." *Id.* § 10606(a)(3)(A).

If the new enhancement had been applicable to Alvarez's sentence, then (holding everything else constant) her total offense level would have been 40 and her guidelines range would have been 292–365 months, or 292–360 with the ceiling imposed by the statutory maximum of 30 years. What that means is if Alvarez committed her crime today, the district court's 30-year sentence would fall within the upper limit of her guidelines range, and we would fully expect that it was reasonable. *See Rita v. United States*, 551 U.S. 338, 347–48 (2007) (appellate court may presume within-guidelines sentence is reasonable); *United States v. Alfaro-Moncada*, 607 F.3d 720, 735 (11th Cir. 2010) (we ordinarily expect that a sentence within the guidelines is reasonable). That expectation would be reinforced by the district court's findings about the specific circumstances of this case: Alvarez's abuse of her position of trust as a doctor; the ongoing nature of the

37

conspiracy; the lower standard of care Alvarez provided to her HIV-positive patients; the need to deter Medicare fraud, particularly in the Miami area; and Alvarez's perjury at trial and her complete lack of remorse.

Even though the amendment to the guidelines does not apply retroactively to Alvarez, it can still inform our consideration of whether thirty years is a reasonable sentence for her crime, particularly in light of all of the specific reasons the district court provided for varying upward on her sentence. Even under the earlier version of the guidelines, only three more points would have put the top of Alvarez's sentence range at 30 years (offense level 40), and only two more in addition to that would have put the bottom of her sentence range at 30 years (offense level 42).

The district court gave many compelling reasons justifying its departure from the Guidelines, and it is within that court's discretion to decide how much weight to give each of the § 3553 factors. The district court thoroughly considered the § 3553 factors and offered compelling justifications for its decision that, taken together, justified a sentence above the Guidelines. *See Gall*, 552 U.S. at 51; *Irey*, 612 F.3d at 1187. Giving that decision the deference it is due, we cannot say that Alvarez's sentence is outside the range of reasonable sentences, or that the district court committed a clear error of judgment in imposing it. *See Irey*, 612 F.3d at 1190; *McBride*, 511 F.3d at 1297–98.

*B. The polygraph examinations*

Alvarez next argues that the district court erred by refusing to consider the exculpatory results of a post-verdict polygraph examination in determining whether to apply an obstruction of justice enhancement. This was error, she argues, because the district court may not "invent a blanket prohibition against considering certain types of evidence at sentencing." *See United States v. Watts*, 519 U.S. 148, 152 (1997). While Mateos tries to couch this claim in the terms of a "refusal to consider" argument, the district court's ruling is better understood as a refusal to give dispositive weight to the results of the third polygraph examination. That is, it was not a blanket prohibition on considering the exams in any case; it was instead a finding that the evidence that Alvarez gave perjured testimony was so overwhelming that no polygraph could sway the district court's decision, especially not a third exam taken after the first two were inconclusive. Given the narrowly worded questions, and the fact that she only passed the test on her third try, the probative value of the test results was minimal.

There was no error in the district court's refusal to give the polygraph exams dispositive weight when they directly contradicted the jury's verdict. In fact, the district court may have abused its discretion if it had given them any weight at all, insofar as they contradicted the jury's verdict that Alvarez had knowledge of the

39

fraud at St. Jude. *See United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008) (below-Guidelines sentence was substantively unreasonable when based on a district court's doubts that defendant actually had criminal intent, which contradicted the jury's verdict). The district court did not clearly err by disregarding the results of the third polygraph exam and applying an obstruction of justice enhancement based on the evidence presented at trial.

*C. The United States as a "victim" under the MVRA*

The Mandatory Victims Restitution Act of 1996 requires district courts to impose restitution in certain cases where "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). The MVRA defines "victim" as:

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

Alvarez argues that the district court was not authorized to order her to pay restitution to the United States government, because the government is not a "victim" or a "person" under the plain terms of the MVRA. While Alvarez is correct that it is somewhat awkward to refer to a government as a person, the

40

surrounding provisions of the MVRA indicate that the term "victim," as used in the MVRA, includes the government.

It is dispositive that the enforcement provisions of the Act explicitly recognize the government as a possible victim. 18 U.S.C. § 3664(i) ("In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution."). "[N]othing indicates that Congress intended two different meanings when it used the same word in §§ 3663A and 3664(i)—related provisions adopted at the same time and codified in serial sections in the United States Code." *United States v. Ekanem*, 383 F.3d 40, 43 (2d Cir. 2004). This provision conclusively resolves any ambiguity in the meaning of the word "victim" in favor of the conclusion that Congress treated the United States government as a potential victim under the MVRA. In reaching this holding, we are in agreement with each of our sister circuits that has addressed this issue. *See United States v. Senty-Haugen*, 449 F.3d 862, 865 (8th Cir. 2006); *Ekanem*, 383 F.3d at 43; *United States v. Lincoln*, 277 F.3d 1112, 1113 (9th Cir. 2002); *United States v. Martin*, 128 F.3d 1188, 1190 (7th Cir. 1997).

D. *The intended loss attributable to Mateos*

We now turn to Mateos's claims of sentencing error, both relating to the district court's calculation of her Guidelines range. First, Mateos argues that the district court erroneously found her responsible for the entire intended loss of the conspiracy (more than $9 million), leading to a twenty-level enhancement of her Guidelines range. *See* U.S.S.G. § 2B1.1(b)(1)(K). She argues that the court erred because it failed to make individualized findings of fact as to the specific scope of her involvement in the conspiracy. We disagree.

A "district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003). Under the Guidelines, "to determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *Id.* at 1319 (citation omitted). Once the court determines the scope of the defendant's involvement in the conspiracy, it then may consider "all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity." *United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir. 2004) (citation omitted).

Mateos's primary argument against attributing the entire loss to her is that, even if Mateos knew that St. Jude was providing medically unnecessary treatments (as the jury concluded), there was no evidence that she knew St. Jude was billing Medicare for infusions that were not provided at all. That is, she only consented to participating in the scheme insofar as patients were actually injected with unnecessary medicine; not to billing Medicare when no treatment was provided at all. The position defies common sense. The evidence established that Mateos knew that St. Jude was purchasing far less WinRho than it was billing Medicare for, and that was the essence of the fraud. Whether a particular patient was injected with saline, a diluted dose of WinRho, or nothing at all, is irrelevant to the object of the conspiracy: to overbill Medicare.

Because it is reasonably foreseeable that a clinic engaged in fraudulently diluting doses of medicine might also be in the practice of billing Medicare when no treatment was provided whatsoever, the district court did not err in attributing the entire intended loss to Mateos. *See McCrimmon*, 362 F.3d at 731–32 (defendant responsible for losses stemming from all reasonably foreseeable acts of coconspirators).

E. *Risk of death or serious injury*

43

Finally, Mateos challenges the district court's two-level enhancement of her Guidelines range based on its finding that her offense involved "conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(13)(A). She argues that there was no evidence supporting the district court's conclusion that she knew or recklessly disregarded the severe risks associated with giving HIV-positive patients the unnecessary treatments prescribed by the doctors at St. Jude.

The district court did not clearly err in finding that a trained nurse, such as Mateos (who also received training as a doctor in Cuba), would be well aware that any injection always carries some risk of infection or other complications, and that the risk is especially high when the patients have HIV and weakened immune systems. *See United States v. Campbell*, 491 F.3d 1306, 1315 (11th Cir. 2007) (reviewing "for clear error the district court's findings of fact regarding whether a defendant should receive an enhanced sentence under the Guidelines" (citation and ellipsis omitted)). Even though there was no evidence that any patient was actually harmed from the treatments, the enhancement was nevertheless appropriate because the Guidelines provision focuses on the defendant's disregard of risk rather than on the result. *See United States v. Snyder*, 291 F.3d 1291, 1294–95 (11th Cir. 2002). The district court did not err in applying the enhancement.

V

For the foregoing reasons, we AFFIRM the district court's judgments.